In re SCOTT CABLE COM-
MUNICATIONS, INC.

United States of America,
Plaintiff–Appellant,

v.

State Street Bank and Trust Company,
Defendant–Appellee,

Scott Cable Communications, Inc.,
Intervenor–Appellee.

Bankruptcy No. 98–51923(AHWS).
Adversary No. 98CV5104(AWT).

United States District Court,
D. Connecticut.

March 9, 2001.

Alan H. Katz, New Orleans, LA.

Ann M. Nevins, Asst. U.S. Attorney, U.S. Attorney's Office, Bridgeport, CT.

Tally F. Parker, Jr., Parker and Marks, PC, Irving, TX.

Joan E. Pilver, Office of Attorney General, Hartford, CT.

## OPINION AND ORDER

THOMPSON, District Judge.

The United States Internal Revenue Service (the "IRS") filed an adversary proceeding seeking a determination that the debt evidence by certain notes issued by the debtor should be recharacterized as preferred equity or the claims of the noteholders should be equitably subordinated to the IRS's claim, notwithstanding the fact that a confirmation order in a prior bankruptcy proceeding determined the notes to be secured debt. The appellees, who are the indenture trustee for the noteholders and the issuer of the notes, respectively, moved for summary judgment. The bankruptcy court determined that the IRS's adversary proceeding is barred by the res judicata effect of the confirmation order entered in the prior bankruptcy proceeding. For the reasons set forth herein, the court concludes that the IRS's adversary proceeding is not barred by principles of res judicata.

### I. *Background*

On February 14, 1996, Scott Cable Communications, Inc., along with six affiliated corporations (collectively, "Original Scott") filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the District of Delaware (the "Delaware Proceeding").

On February 28, 1996, the United States Attorney's Office for the District of Dela-

ware filed, in the Delaware Proceeding, a "Notice of Appearance, Request for Matrix Entry and Request for Service of Notices and Documents" on behalf of the United States of America. The notice of appearance represented that the United States of America was a "party in interest" in the Delaware Proceeding. On June 12, 1996, the United States also filed in the Delaware Proceeding a "Notice of Appearance, Request for Matrix Entry and Request for Service of Notice and Documents" and a motion for admission pro hac vice on behalf of an Assistant District Counsel for the IRS.

The IRS office in that district had encountered problems in terms of not getting notice of objections to claims filed by the IRS. Consequently, it followed a procedure of filing a notice of appearance for any bankruptcy where substantial assets or a large number of creditors were involved. The second notice of appearance was filed because the attorney named in the first notice went on an extended leave. The United States, on behalf of the IRS, never filed a proof of claim for prepetition federal taxes or a request for payment of administrative expenses in the Delaware Proceeding.

On October 31, 1996, Original Scott filed a Second Amended Joint Plan of Reorganization (the "Delaware Plan") (Appellees' Joint Br. (Doc. # 9), J.A. at A1) and a Second Amended Disclosure Statement and Second Amended Joint Plan of Reorganization (the "Delaware Disclosure Statement") (Appellees' Joint Br. (Doc. # 9), J.A. at A53). The IRS received both the Delaware Plan and the Delaware Disclosure Statements.

Article II of the Delaware Plan provided for full payment in cash or cash equivalents, on the effective date of the plan, of all "Administrative Expenses" and "Tax Claims." Article III of the Delaware Plan described 15 classes of other claims and interests. Class 6 Claims were unsecured claims of holders of what were termed the "Public Subordinated Debentures," and Class 7 Claims were unsecured claims of holders of what were termed the "Junior Subordinated Notes."

Section 4.6 of the Delaware Plan provided, as to the Class 6 Claims, in relevant part, as follows:

In full satisfaction of the Allowed Class 6 Claims, each holder thereof shall receive . . . (d) a negotiable certificate representing each holders' Ratable Share of its undivided interest in the New Restructured Second Secured PIK Notes and all of the New Class C Common Stock, and (e) a negotiable certificate representing each holders' Ratable Share of its undivided interest in fifteen (15%) percent of the New Restructured Third Secured PIK Notes.

Section 4.7 of the Delaware Plan provided, as to Class 7 Claims, as follows:

In full satisfaction of the Allowed Class 7 Claims, each holder thereof shall receive on the Effective Date (a) a negotiable certificate representing each holders' Ratable Share of its undivided interest in eighty-five (85%) percent of the New Restructured Third Secured PIK Notes and (b) its ratable Share of all of the New Class B Common Stock.

At issue in the adversary proceeding is the payment of the New Restructured Third Secured PIK Notes (the "Third Secured PIK Notes").

Section 1.49 of the Delaware Plan defined "New Restructured Third Secured PIK Note" as follows:

New Restructured Third Secured PIK Note means the new promissory note to be issued by Reorganized Scott to the holders of the Class 6 and 7 claims in substantially the form set forth in the New Restructured Third Secured PIK Note Indenture. The New Restructured Third Secured PIK Note shall: (i) be in the initial aggregate principal amount of $38,925,797, (ii) pay interest semi-annually through the issuance of additional New Restructured Third Secured PIK Notes at the rate of 16% per

annum on the unpaid principal balance, (iii) mature five (5) years and seven (7) months from the Effective Date, subject to acceleration upon the occurrence of certain events, and (iv) be secured by a lien on all of the assets of Scott, which lien shall be subordinate to the liens granted to the holders of the (a) Post–Confirmation Credit Facility, and (b) holders of the New Restructured Second Secured PIK Note.

In describing and summarizing the Delaware Plan, the Delaware Disclosure Statement stated in Article V.D., regarding the Class 7 Claims, in relevant part, as follows:

9. *Class 7 Claims (Unsecured Claims of the holders of Unsecured Junior Subordinated Notes).* Class 7 Claims consist of the Claims arising out of the Unsecured Junior Subordinated Notes. The amount of such Claims as of the Effective Date is expected to be $38,925,797.... For a general description of the New Restructured Third Secured PIK Notes and the New Class B Common Stock, see Section [V.] E— "Reorganization Securities." The payments due on the New Restructured Second Secured PIK Notes and New Restructured Third Secured PIK Notes will be made from a subsequent refinancing and/or sale of one or more of the cable television systems owned by Scott (See Article VII.E—"Future Operations and Expectations—Projected Payment to Holders of PIK Notes").

Article V.E. stated, regarding the Third Secured PIK Notes, in relevant part, as follows:

2. *New Restructured Third Secured PIK Notes and Indenture*

The New Restructured Third Secured PIK Notes will be issued pursuant to the New Restructured Third Secured PIK Note Indenture to be dated as of the Effective Date between Reorganized Scott and the New Third PIK Note Indenture Trustee. The New Restructured Third Secured PIK Note shall:

... (iv) be secured by a lien on all of the assets of Reorganized Scott.... The New Restructured Second Secured PIK Notes, the Restructured Second Secured PIK Note Indenture and/or the Charter of Reorganized Scott will contain provisions prohibiting the management of Reorganized Scott, the Board of Directors and the holders of the New Restructured Third Secured PIK Notes from causing a subsequent bankruptcy of Reorganized Scott without the consent of the holders of the New Restructured Second Secured PIK Notes or the directors appointed by the New Class C Common Stock. The form of the New Restructured Third Secured PIK Notes and the New Restructured Third Secured PIK Noted Indenture shall be filed with the Bankruptcy Court no less than ten (10) days prior to the hearing on confirmation of the Plan.

Article VII.E. of the Delaware Disclosure Plan stated, in relevant part, as follows:

E. Projected Payment to Holders of PIK Notes.

... Consequently, except for the cash payment of $6,087,153 expected to be made to holders on the Effective Date of Class 6 claims, holders of claims in Class 6 and 7 will not receive any cash payment on account of the Reorganization Securities they will receive under the Plan until the New Restructured Second Secured PIK Notes and New Restructured Third Secured PIK Notes mature.

The Debtors expect that the New Restructured Second Secured PIK Notes and New Restructured Third Secured PIK Notes will be paid from the proceeds of a subsequent refinancing of Reorganized Scott's indebtedness or from the proceeds of a "Transaction Event" which is defined in the Plan as (i) the merger, consolidation, liquidation, reorganization or dissolution of Reorganized Scott, (ii) the sale of all of the cable television systems currently owned by Scott, and (iii) any similar transaction,

including, without limitation, the reclassification of the capital stock of Reorganized Scott or the dividend or other distribution of any corporate assets to shareholders.[3] The Debtors expect that the financing or a Transaction Event will occur before January 1, 2000. . . .

3. The maturity of both the New Restructured Second Secured PIK Notes and the New Restructured Third Secured PIK Notes will accelerate upon the occurrence of a Transaction Event.

Regardless of when a refinancing or Transaction Event occurs, there is no assurance that Reorganized Scott will be able to realize the value necessary to pay the New Restructured Second Secured PIK Notes ... or the New Restructured Third Secured PIK Notes ... In the event the New Restructured Second Secured PIK Notes and New Restructured Third Secured PIK Notes cannot be paid off in full at maturity, it may be necessary for Reorganized Scott to commence another case under the Bankruptcy Code, in which event the claims represented by the New Restructured Second Secured PIK Notes and New Restructured Third Secured PIK Notes should be secured claims (to the extent the value of their collateral is equal to or exceeds the amount of the debt) as opposed to the unsecured status of Classes 6 and 7 claims under the Plan.

Article IX.A. of the Delaware Disclosure Statement stated that the debtors believed that the Delaware Plan provided the greatest and earliest possible recoveries to creditors. It also discussed liquidation as an alternative to the Delaware Plan, and stated that it would not be in the best interests of the debtor and their creditors. Article IX.A.2. stated: "The Plan restructures the obligations of the Debtors in a manner that, the Debtors believe, will enable Scott to continue as a viable, going concern." Article IX.A.2. referred to a liquidation analysis, which was attached as an exhibit. The liquidation analysis showed "Liquidation Proceeds Available to Scott Creditors" of $128,514,000, and then showed the following:

II. Recovery By Scott Creditors

| | | |
|---|---|---|
| A. | Liquidation Proceeds Available | $128,514,000 |
| B. | Scott Liabilities | |
| | Secured Creditors | 50,000,000 |
| | Administrative Expenses | 2,000,000[ ] |
| | Tax Claims | 43,965,000[7] |
| | | $ 32,549,000 |

7 Represents estimated tax liability based on assumed capital gain of $120,914,000, reduced by estimated net operating loss carry forward available to Scott of approximately $11,000,000.

The liquidation analysis then shows the "Class 7 (Junior Subordinated)" debt as being lower in priority than the tax claims and recovering nothing if there was a liquidation. The "Claim 6 (Public Subordinated)" debt was also shown as being lower in priority than the tax claims but obtaining a 34% recovery if there was a liquidation.

Article IX.C. of the Delaware Disclosure Statement contained the following language concerning the feasibility of the plan:

The Bankruptcy Code provides that a plan may be confirmed only if the confirmation is not likely to be followed by a liquidation or the need for further financial reorganization, unless such liquidation or reorganization is expressly provided for in the Plan. In essence, this provision requires that the Bankruptcy Court find that the Debtors are capable of fulfilling their commitments in the Plan, while operating as a viable concern, or put simply, that the plan is feasible.

The IRS received both the Delaware Plan and the Delaware Disclosure Statement.

On December 6, 1996, the Delaware Bankruptcy Court issued an order (the "Delaware Confirmation Order") (Appellees' Joint Br. (Doc. # 9), J.A. at A110.07) confirming the Delaware Plan. Paragraph 4 of the Delaware Confirmation Order de-

scribed the persons as to whom the order would be binding:

> The Plan and its provisions shall be binding upon (i) the Debtors, (ii) any entity acquiring or receiving property under the Plan, (iii) any lessor or lessee of property to the Debtors, and (iv) any Claim or Interest holder of the Debtors, whether or not the Claim or Interest of such Claim or Interest holder is impaired under the Plan and whether or not such Claim or Interest holder has accepted the Plan.

This provision in the order was consistent with both the Delaware Plan and the Delaware Disclosure Statement. A "Claim" was defined as a claim, as that term is defined in section 101(5) of the Bankruptcy Code, against a debtor in the Delaware Proceeding. *See* 11 U.S.C. § 101(5) (1993). An "Interest" was defined as an equity security, within the meaning of section 101(16) of the Bankruptcy Code, in a debtor in the Delaware Proceeding. *See* 11 U.S.C. § 101(16) (1993).

In addition, Paragraph 13 of the Delaware Confirmation Order provided:

> The terms and conditions of the New Restructured Second Secured PIK Note Indenture and New Restructured Third Secured PIK Note Indenture, and the forms thereof as may be finalized upon the execution thereof by the Reorganized Debtors, shall constituted the legal, valid and binding obligations of the Reorganized Debtors, enforceable against the Reorganized Debtors in accordance with their respective terms and are entered into for good and valuable consideration, including the benefits of the Plan.

On July 10, 1998, Scott Cable Communications, Inc. executed an Asset Purchase and Sale Agreement (the "Asset Purchase Agreement") for the sale of substantially all of its assets. The capital gains tax consequences of the sale have been estimated at $29.9 million and $7.5 million for federal and state taxing authorities, respectively. On October 1, 1998, Scott Cable Communications, Inc. filed the Chapter 11 bankruptcy petition in this matter along with a prepackaged liquidating plan (the "Connecticut Plan"). The Connecticut Plan incorporated the Asset Purchase Agreement, including the requirement that the closing of the sale occur after the confirmation order was entered. The Connecticut Plan did not provide for payment of any capital gains tax on the basis that the closing of the sale would occur post-confirmation. A Disclosure Statement dated August 17, 1998 (the "Connecticut Disclosure Statement") (Appellees' Ex. 1) had been prepared on behalf of Scott Cable Communications, Inc. in connection with the Connecticut Plan. Article VIII.A. of the Connecticut Disclosure Statement was entitled "TAX CONSEQUENCES TO DEBTOR ARISING FROM THE SALE OF THE SALE ASSETS," which included the following language:

> HOWEVER, THE PLAN DOES NOT PROVIDE FOR THE PAYMENT OF THE AMOUNT OF THIS FEDERAL INCOME TAX LIABILITY (OR OF ANY STATE OR LOCAL INCOME OR SIMILAR TAX LIABILITY ATTRIBUTABLE TO THE SALE). RATHER, THE COMPANY BELIEVES THAT SINCE ANY CLAIMS FOR TAXES ATTRIBUTABLE TO THE SALE ARISE SUBSEQUENT TO CONFIRMATION OF THE PLAN, THEY NEED NOT BE PROVIDED FOR IN THE PLAN AND SUCH CLAIMS WILL BE PAYABLE ONLY TO THE EXTENT THAT PROCEEDS REMAIN AVAILABLE AFTER THE DISTRIBUTIONS CONTEMPLATED UNDER THE PLAN ARE MADE.

> AS DESCRIBED ABOVE, THE COMPANY BELIEVES NO PROCEEDS WILL BE AVAILABLE AFTER PAYMENT OF CLAIMS ENTITLED TO PAYMENT UNDER THE PLAN. THE CONTEMPLATED FEDERAL, STATE AND LOCAL INCOME OR SIMILAR TAX LIABILITIES THAT MAY ARISE AS A RE-

SULT OF THE SALE ARE, IN ANY EVENT, JUNIOR IN LEGAL PRIORITY TO THE SECURED CLAIMS OF ... THE [THIRD] SECURED PIK NOTE CLAIMS AND ARE ENTITLED TO BE PAID ONLY AFTER THOSE CLAIMS ARE SATISFIED IN FULL. ACCORDINGLY, EVEN IF SUCH CLAIMS WERE PROVIDED FOR UNDER THE PLAN, SUCH CLAIMS WOULD BE JUNIOR IN RIGHT OF PAYMENT TO THE PREVIOUSLY DESCRIBED SECURED CLAIMS....

THUS, THE IRS AND ANY STATE AND LOCAL TAXING AUTHORITIES SHOULD BE AWARE THAT IT IS INTENDED THAT NO DISTRIBUTIONS WILL BE MADE TO THEM RELATING TO THE TAX CONSEQUENCES OF THE ASSET SALE UNDER THE TERMS OF THE PLAN OR OTHERWISE.

On November 13, 1998, the bankruptcy court authorized the sale pursuant to the Asset Purchase Agreement and, three days later, the IRS objected to confirmation of the Connecticut Plan. The bankruptcy court sustained the IRS's objection on December 11, 1998, finding that the capital gains tax was an administrative expense and that the plan was a tax avoidance scheme. *See In re Scott Cable Comm., Inc.,* 227 B.R. 596, 600 (Bankr. D.Conn.1998).

On November 19, 1998, the IRS commenced the instant adversary proceeding against the indenture trustee. The IRS seeks a determination that the debt evidenced by the Third Secured PIK Notes, which are now termed the "Junior Subordinated Secured PIK Notes", should be recharacterized as preferred equity, and that the claims of the holders of the Junior Subordinated Secured PIK Notes should be equitably subordinated to the IRS's claim.

Notwithstanding the denial of confirmation, the debtor concluded that the sale pursuant to the Asset Purchase Agree-

ment was in the best interest of the estate and the creditors and moved for court approval of the sale, which was granted on January 14, 1999. The sale closed on or about February 12, 1999, and all secured debt senior to the claims of the holders of the Junior Subordinated Secured PIK Notes was paid in full. Approximately $30,291,296 of the proceeds remained. The holders of the Junior Subordinated Secured PIK Notes asserted a claim of $49,035,294 plus accrued interest.

## II. *Standard of Review*

■ A district court reviewing a bankruptcy court's findings of fact uses the clearly erroneous standard. *See* Fed. R.Bankr.P. 8013; *Shugrue v. Air Line Pilots Ass'n Int'l (In re Ionosphere Clubs, Inc.),* 922 F.2d 984, 988 (2d Cir.1990). "A finding [of fact] is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.,* 333 U.S. 364, 395, 68 S.Ct. 525, 92 L.Ed. 746 (1948). A district court reviews a bankruptcy court's conclusions of law de novo. *See Shugrue,* 922 F.2d at 988; *In re Colony Hill Assoc.,* 111 F.3d 269, 273 (2d Cir.1997). Application of the principles of res judicata presents a question of law to be reviewed de novo. *Computer Assocs. Int'l, Inc., v. Altai, Inc.,* 126 F.3d 365, 368 (2d Cir.1997).

## III. *Discussion*

■ "The doctrine of res judicata, or claim preclusion, holds that a final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Monahan v. New York City Dep't of Corrections,* 214 F.3d 275, 284–85 (2d Cir.2000) (quotation marks omitted). Res judicata therefore bars the subsequent litigation of any claims arising from the transaction or series of transactions which was the subject of the prior

suit. *See Interoceanica Corp. v.. Sound Pilots, Inc.*, 107 F.3d 86, 90 (2d Cir.1997) (citing Restatement (Second) of Judgments § 24(b) (1982)); Restatement (Second) of Judgments 24 cmt. a ("Claim, in the context of res judicata, has never been broader than the transaction to which it related."). The burden is on the party seeking to invoke res judicata to prove that the doctrine bars the second action. *See Thomas v. New York City*, 814 F.Supp. 1139, 1148 (E.D.N.Y.1993).

"A bankruptcy court confirmation order generally is treated as res judicata." *In re Linkous*, 990 F.2d 160, 162 (4th Cir.1993). Section 1141(a) of the Bankruptcy Code provides:

> Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

11 U.S.C. § 1141(a) (1993). "The Supreme Court has … made clear that parties who believe that a provision of a reorganization plan is improper should challenge it in the Bankruptcy Court, not in subsequent collateral proceedings." *State of Maryland v. The Antonelli Creditors' Liquidating Trust*, 191 B.R. 642, 644 (D.Md.1995) (citing *Celotex Corp. v. Edwards*, 514 U.S. 300, 313, 115 S.Ct. 1493, 131 L.Ed.2d 403 (1995)).

However, it is important to note that "a fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *In re Linkous*, 990 F.2d [at] 162[ ], quoting *Mullane v. Central Hanover Bank Trust Co.*, 339 U.S. 306, 314[, 70 S.Ct. 652, 94 L.Ed. 865] (1950).

*In re Friedman*, 184 B.R. 883, 887–88 (Bankr.N.D.N.Y.1994).

Government entities have no right to due process under the Fifth Amendment's due process clause. *See United States v. Cardinal Mine Supply*, 916 F.2d 1087, 1089 n. 3 (6th Cir.1990) (citing *South Carolina v. Katzenbach*, 383 U.S. 301, 323–24, 86 S.Ct. 803, 15 L.Ed.2d 769 (1966)). However, as the Supreme Court recognized in *City of New York v. New York, N.H. & H.R. Co.*, 344 U.S. 293, 297, 73 S.Ct. 299, 97 L.Ed. 333 (1953), it is "a basic principle of justice … that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights." Also, as noted by the court in *Cardinal Mine Supply*, which was also a case where the adequacy of notice to the IRS was at issue:

> *City of New York* was not decided upon due process grounds, for the city of New York, like the IRS in the present case, does not have a constitutional right to due process. *City of New York* involved a statutory mandate that notice be given, and section 342 of the Bankruptcy Code provides a similar mandate. This section provides: "There shall be given such notice as is appropriate of an order for relief in a case under this title." 11 U.S.C. § 342. The legislative history of this provision notes that "[d]ue process will certainly require notice to all creditors…. State and Federal governmental representatives responsible for collecting taxes will also receive notice." S.Rep. No. 989, 95th Cong., 2d Sess. 42 (1978), U.S.Code Cong. & Admin.News 1978, pp. 5787, 5828, reprinted in Collier on Bankruptcy, App. vol. 3 (15th ed.1990). Further, at least one court has found that "[t]he language in *City of New York* clearly is not grounded in goals unique to the former bankruptcy act." *Spring Valley Farms, Inc. v. Crow*, 863 F.2d 832, 835 (11th Cir.1989).

The Court's reasoning in *City of New York* is equally applicable to the case before this Court, and thus the basic principle of justice that notice and an opportunity to be heard are necessary before a party's claim is barred applies to the present case as well.

*Cardinal Mine Supply,* 916 F.2d at 1090. Thus, "[i]n the case of governmental entities, 'adequate notice' must satisfy requirements of 'fundamental fairness'". *Friedman,* 184 B.R. at 888 n. 1; *see also In re Hairopoulos,* 118 F.3d 1240, 1244 n. 3 (8th Cir.1997).

■ In determining what is, in the present case, adequate notice to a governmental entity, satisfying the requirements of fundamental fairness, it is appropriate to utilize standards developed in the context of due process. This is so because any interpretation of the Bankruptcy Code's requirements for adequate notice as to the IRS will be equally applicable to private parties. Thus, due process rights are implicated. *See Cardinal Mine Supply,* 916 F.2d at 1089–90.

The Supreme Court articulated certain basic principles of due process in the seminal case of *Mullane v. Central Hanover Bank & Trust Co.:*

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.... The notice must be of such nature as reasonably to convey the required information, ... and it must afford a reasonable time for those interested to make their appearance....

But when notice is a person's due, process which is a mere gesture is not due process. The means employed must be such as one desirous of actually informing the absentee might reasonably adopt to accomplish it.

339 U.S. 306, 314–15, 70 S.Ct. 652, 94 L.Ed. 865 (1950) (citations omitted). In the case of *In re Basham,* the court analyzed three different approaches to determining what notice is sufficient in the context of a bankruptcy proceeding for purposes of res judicata, and adopted a standard based on language in *Mullane,* concluding that the best approach is as follows:

Looking to the contents of the notice to determine if the notice is reasonably calculated, under the circumstances, to apprise interested parties that their rights may be modified, is a flexible approach that encompasses the totality of circumstances presented in each case. Such approach allows the Court to consider a creditor's sophistication, the amount of their involvement in the bankruptcy proceeding, as well as, that creditor's reliance on the claims allowance procedures as demonstrated by a proof of claim filed before plan confirmation.

*In re Basham,* 167 B.R. 903, 908 (Bankr. W.D.Mo.1994). The court rejected the notion that "a confirmed plan is only binding on creditors who participate in the confirmation process," as well as the notion that "notice of the filing of the petition is sufficient to apprise a secured creditor that its rights are to be modified...." *Id.* at 907–08; *accord In re Bowen,* 174 B.R. 840, 849 (Bankr.S.D.Ga.1994).

Finally, when determining whether a notice is reasonably calculated to inform a party that its rights may be modified, it is appropriate to keep in mind that the Bankruptcy Code requires full and fair disclosure.

Of prime importance in the reorganization process is the principle of disclosure. The Code obliges a Debtor to engage in full and fair disclosure, providing to creditors "information of a kind, and in sufficient detail, as far as is reasonably practicable ... that would enable a hypothetical reasonable investor typical of holders of claims or interests of the relevant class to make an

informed judgment about the plan...." 11 U.S.C. § 1125(a)(1). This disclosure requirement does not attach only to the preparation of disclosure statements. "Full and fair" disclosure is required during the entire reorganization process; it begins "on day one, with the filing of the Chapter 11 petition." *In re V. Savino Oil & Heating Co.*, 99 B.R. 518, 526 (Bankr.E.D.N.Y.1989).

*In re Momentum Mfg. Corp.*, 25 F.3d 1132, 1136 (2nd Cir.1994).

The IRS argued before the bankruptcy court that it was not bound by the Delaware Confirmation Order because it was not a creditor of a debtor in the Delaware Proceeding, nor was it any other person described in 11 U.S.C. § 1141(a). The bankruptcy court rejected this argument and adopted a position advocated by the appellees, namely that the IRS was bound because, based on its own filings in the Delaware Proceeding, it was a party in interest and had adequate notice that its pecuniary interests could be adversely affected by the Delaware Plan having received the Delaware Plan and the Delaware Disclosure Statement. The bankruptcy court concluded that the IRS had been given "an opportunity to be heard on any issue that foreseeably implicated it interests," and, in addition, that "[s]ince the Delaware Plan implicated the IRS's pecuniary interests, it could have sought an order that would have subordinated [Third Secured PIK Note] holders to any uncollected taxes arising out of the sale of" the assets of Reorganized Scott. *In re Scott Cable*, 232 B.R. at 564.

 Assuming, *arguendo*, that the IRS was a party in interest in the Delaware Proceeding, and that this status, as opposed to status as a creditor or other person described in 11 U.S.C. § 1141(a), would be sufficient for purposes of making it bound by the terms of the confirmed Delaware Plan, this court nonetheless concludes that the IRS is not bound here because it did not receive adequate notice in the Delaware Proceeding that its pecu-

niary interests would be implicated. Any notice in the Delaware Plan and the Delaware Disclosure Statement that the plan affected the priority of the IRS's tax claims for possible capital gains arising out of a possible sale of the assets of Reorganized Scott was not reasonably calculated, under the circumstances, to apprise the IRS of that fact.

This court agrees with the bankruptcy court that the IRS could have sought an order in the Delaware Proceeding that would have subordinated the claims of the Third Secured PIK Note holders to any capital gains tax liability arising out of the sale of the assets of Reorganized Scott. However, the Delaware Plan and the Delaware Disclosure Statement failed to make any mention of any such pecuniary interest of the IRS that could be adversely affected by the plan. While this court does not conclude that failure to mention in the disclosure statement a pecuniary interest of a party in interest necessarily means that person is not being given adequate notice, it does conclude that the circumstances present in the Delaware Proceeding translated that failure into a failure to give the IRS adequate notice that its pecuniary interests could be adversely affected by the Delaware Plan.

First, the IRS was not a creditor in the Delaware Proceeding, and consistent with the provisions of the Delaware Confirmation Order, nothing in the Delaware Plan or the Delaware Disclosure Statement stated that the plan would be binding on anyone other than the debtors, entities acquiring property under the plan, lessors or lessees of property to a debtor, the holder of a claim against a debtor, or the holder of an equity security in a debtor, none of which categories included the IRS.

Second, the Delaware Plan and the Delaware Disclosure Statement addressed "Tax Claims." Both explicitly stated that all "Tax Claims" would be paid in full. There was no indication in the definition of the term "Tax Claim," nor in the provision

of the Delaware Plan addressing "Tax Claims," nor anywhere in the Delaware Disclosure Statement, that an intended or a possible consequence of the plan was that under certain scenarios the IRS would be precluded from, or limited in any way in, pursuing a claim against Reorganized Scott once the Delaware Plan was confirmed. Also, Article X of the Delaware Disclosure Statement purported to describe "certain federal income tax consequences of the plan," but it makes no mention of any such intended or possible tax consequences of the Delaware Plan. Nor does it include a disclaimer that the tax consequences of Transaction Events that could be undertaken by Reorganized Scott were not being addressed. It does however state:

> THERE CAN BE NO ASSURANCE THAT THE IRS WILL NOT CHALLENGE ANY OR ALL OF THE TAX CONSEQUENCES OF THE PLAN . . .

Del. Disclosure Statement, at 46. Moreover, while the appellees argue, in substance, that the liquidation analysis in the Delaware Disclosure Statement gave the IRS adequate notice that any claim it might have for capital gains tax would be behind the claims of the holders of the Third Secured PIK Notes, that is not the case. That liquidation analysis purports so speak to a liquidation in lieu of confirmation of the Delaware Plan, not a liquidation after confirmation of the Delaware Plan, and certainly not one after such confirmation and the filing of a subsequent

bankruptcy. Also noteworthy is the fact that the liquidation analysis reflects payment of the capital gains tax.[1]

Third, the IRS is a sophisticated party and one can presume, as the appellees noted at oral argument, that the IRS was aware, at the time it received the Delaware Plan and the Delaware Disclosure Statement, that it had the right under 11 U.S.C. § 1128(b) to object to the plan and also that it had the right under 11 U.S.C. § 1128(d) to request that the plan not be confirmed if the principal purpose of the plan was avoidance of taxes. However, in assessing how the IRS's knowledge of the relevant law would have informed its understanding of the information being conveyed by the Delaware Plan and the Delaware Disclosure Statement, one can also presume that the debtors in the Delaware Proceeding prepared, and that the IRS reviewed, the Delaware Plan and the Delaware Disclosure Statement with their perspective shaped by the knowledge that the Declaratory Judgment Act, 28 U.S.C. § 2201, specifically excludes (with certain exceptions not pertinent to the Delaware Proceeding) future tax disputes from the scope of bankruptcy jurisdiction. Thus the relevant law should not have caused the IRS to see any particular "red flags."

Fourth, the Delaware Plan and the Delaware Disclosure Statement stated clearly that whereas the holders of the Third Secured PIK Notes formerly held unsecured debt, they would hold secured debt once the plan was confirmed. However, as to

---

1. Based on this record, it is not clear to the court whether Original Scott knew that one of the consequences of confirmation of the Delaware Plan could be to adversely affect the pecuniary interests of the IRS. Assuming, *arguendo*, that Original Scott did know that one of the consequences of confirmation of the Delaware Plan could be to adversely affect a tax claim of the type the IRS now seeks to pursue, then there is no evidence that Original Scott took any measure calculated to give notice, in the Delaware Disclosure Statement, of that fact. In this regard, the notice given to taxing authorities in the Connecticut Disclosure Statement stands in stark contrast to

that given in the Delaware Disclosure Statement, even after one adjusts for the fact that a definite course of action was contemplated in the instant bankruptcy. On the other hand, if Original Scott was not aware of the fact that one of the consequences of confirmation of the Delaware Plan could be to adversely affect the pecuniary interests of the IRS, then it is clear that it took no steps calculated to give notice of that fact; any notice given was the result of coincidence. Moreover, even if Original Scott was unaware, then it is difficult to see how the IRS could be expected to have discerned that its pecuniary interests could be adversely affected.

the implications of that fact, those documents were calculated to give assurances to the holders of those notes that in the event it became necessary for Reorganized Scott to file for bankruptcy, the holders of those notes would hold secured claims, instead of the unsecured claims they held at that time. Also, this disclosure was made in the context of a plan where the bankruptcy of Reorganized Scott was not a likely scenario. The statement concerning the feasibility of the Delaware Plan made it clear that the plan would not be confirmed unless the bankruptcy court found that Reorganized Scott could fulfill its commitments while operating as a viable concern, and as reflected in Article V.E. of the Delaware Disclosure Statement, a limitation on the ability of the management and board of directors of Reorganized Scott to cause a subsequent bankruptcy was in its charter and in the indenture for the New Restructured Second Secured PIK Notes. In addition, there was no mention of the fact that under certain scenarios the holders of those notes would improve their position relative to claims by the IRS as a result of a subsequent bankruptcy.

Fifth, the Delaware Plan and the Delaware Disclosure Statement gave notice of the fact that one possibility under the plan was that the Third Secured PIK Notes would be paid from the proceeds of the sale of all of the cable television systems then owned by the debtors. However, that was only one of a number of possibilities for paying off those notes, which included a refinancing of Reorganized Scott's indebtedness and unlimited other possibilities covered by the definition of the term "Transaction Event". Moreover, it was not clear that the sale scenario would involve the sale of all of the systems. The Delaware Disclosure Statement provided at one point that the payments due on the Third Restructured PIK Notes "will be made from a subsequent refinancing and/or sale of one or more of the cable television systems . . . ." Del. Disclosure Statement, at 25–26.

Sixth, one can presume that the debtors in the Delaware Proceeding prepared the Delaware Disclosure Statement with the knowledge that they had a duty to make full and fair disclosure and furthermore, that they knew that readers of the disclosure statement would assume that it contained full and fair disclosure.

■ Thus, the circumstances in the Delaware Proceeding were such that the IRS did not hold a claim and thus was not a creditor relying on the claims allowance procedures and the information conveyed to the IRS tended to suggest that the IRS was not affected by the plan; that the information conveyed to the IRS tended to suggest that all tax claims were being paid; that the relevant law which would have informed the IRS's understanding of the information being conveyed to it should not have caused the IRS to see any particular "red flags"; that the discussion, in the information conveyed to the IRS, about the implications of the conversion to secured creditor status of the holders of the Third Secured PIK Notes was suggestive of other concerns; that, in the information conveyed to the IRS, there was no clear, limited set of possibilities; and that the IRS was entitled to assume it would receive full and fair disclosure. It is true that the IRS should be deemed to be sophisticated. It is also true that a thorough analysis of all the scenarios that were possible as a result of confirmation of the Delaware Plan would have revealed to the IRS that its pecuniary interests could be adversely affected under certain scenarios. However, where it is the common understanding that what the law requires is full and fair disclosure, where the circumstances tended to indicate that confirmation of the plan would not adversely affect any pecuniary interest of the IRS, and where nothing in the Delaware Plan or the Delaware Disclosure Statement explicitly stated or even suggested that, in fact, the IRS's pecuniary interests could be adversely affected, it can not be said that the

plan or the disclosure statement was reasonably calculated to inform even a sophisticated party in interest like the IRS that its pecuniary interests could be affected. Notice, given in such a way that a thorough analysis of all the possible scenarios is required before the recipient can discern that its pecuniary interests could be adversely affected, is not notice given by a "means ... such as one desirous of actually informing the absentee might reasonably adopt to accomplish it," *Mullane*, 339 U.S. at 315, 70 S.Ct. 652, nor does it appear to satisfy the requirement that there be disclosed "information of a kind, and in sufficient detail," *In re Momentum Mfg. Corp.*, 25 F.3d at 1136, as would enable a person to make an informed judgment about the plan. *See also In re Interstate Cigar Co.*, 150 B.R. 305, 309 (Bankr. E.D.N.Y.1993) ("The focus of due process is on 'the duty of the debtor to give notice of the relevant dates, not on the relative ease with which a creditor can obtain the information without such notice.' ").

Accordingly, the court concludes that the IRS is not barred by principles of res judicata from proceeding with the instant adversary proceeding because it did not receive notice reasonably calculated, under the circumstances, to inform it that its rights might be modified by the Delaware Plan.

### IV. *Conclusion*

For the reasons set forth above, the bankruptcy court's order granting the defendants' motion for summary judgment is hereby reversed, and this case is hereby remanded for further proceeding in accordance with this opinion.

It is so ordered.