**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**July 25, 2006**

**Elisabeth A. Shumaker**
**Clerk of Court**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

STATE OF OKLAHOMA, ex rel.,
THE OKLAHOMA TAX
COMMISSION, a state agency,

      Plaintiff-Appellant,

v.

INTERNATIONAL REGISTRATION
PLAN, INC.,

      Defendant-Appellee.

No. 04-6320

---

**Appeal from the United States District Court**
**for the Western District of Oklahoma**
**(D.C. No. 02-CV-1798-H)**

---

Joe M. Hampton (Patrick M. Ryan, Timothy J. Bomhoff, Amy J. Pierce, with him
on the briefs), Ryan, Whaley & Coldiron, Oklahoma City, Oklahoma, for
Plaintiff-Appellant.

Robert D. Nelon (Jon Epstein with him on the briefs), Hall, Estill, Hardwick,
Gable, Golden & Nelson, P.C., Oklahoma City, Oklahoma, for Defendant-
Appellee.

---

Before **KELLY**, **HENRY**, and **MURPHY**, Circuit Judges.

---

**MURPHY**, Circuit Judge.

## I. INTRODUCTION

Oklahoma alleges sanctions imposed on it by International Registration Plan, Inc. ("IRP") are invalid because they stemmed from a fundamentally unfair dispute resolution process. Oklahoma filed suit against IRP in the United States District Court for the Western District of Oklahoma, seeking a declaration the sanctions were invalid. Oklahoma moved for a preliminary injunction to prohibit enforcement of the sanctions. The district court denied Oklahoma's motion, holding Oklahoma did not show it was likely to prevail on the merits and did not show an injunction was in the public interest. Oklahoma appealed the district court's order. This court requested supplemental briefing as to whether the Tax Injunction Act ("TIA"), 28 U.S.C. § 1341, deprived the district court of jurisdiction in this case. After considering the arguments submitted by Oklahoma and IRP, we hold the district court's jurisdiction was proper. We therefore exercise jurisdiction pursuant to 28 U.S.C. § 1292(a)(1) and **affirm** the decision of the district court.

## II. BACKGROUND

> A.    *The International Registration Plan and the Dispute Resolution Committee.*

IRP administers the International Registration Plan ("Plan"), a vehicle registration reciprocity agreement among U.S. states and Canadian provinces. The Plan allows commercial vehicle owners engaged in interstate commerce to

register their vehicles in a single "base jurisdiction," rather than registering separately in all jurisdictions through which their vehicles travel. The base jurisdiction allocates licensing or registration fees to other states and provinces based on the percentage of miles the vehicle traveled in those jurisdictions. The forty-eight contiguous states, the District of Columbia, and a number of Canadian provinces are members of the Plan.[1]

Member jurisdictions adopted a charter authorizing the creation of a Dispute Resolution Committee ("Committee" or "DRC"); the Committee is empowered to exercise the IRP Board of Directors' ("Board") authority to answer questions of Plan interpretation, resolve disputes, and enforce compliance with the Plan. Seven voting members sit on the DRC,[2] each of whom is appointed by the Board Chairman to serve a two-year term.

B.    *The Dispute*

As provided in the Plan, the State of Illinois filed with IRP a "Class 1" dispute against Oklahoma; the dispute alleged Oklahoma's vehicle registration regulations violated the Plan and resulted in monetary loss to Illinois. Illinois

---

[1]A state which is not a member of the Plan is barred from imposing an independent vehicle registration scheme upon vehicles registered in a state which does participate in the Plan. 49 U.S.C. § 31704 (1997).

[2] The seven voting members of the Committee must include a member of the IRP Board who serves as Chair of the Committee, a member of the IRP Board who serves as Vice Chair of the Committee, one member from each American Association of Motor Vehicles Administrators region, and one member from the Canadian provinces.

claimed Oklahoma failed to comply with the Plan when it collected and retained more than $15 million in apportioned fees that should have been remitted to Illinois. The DRC heard Illinois' claim in April of 2002.[3] The Committee determined Oklahoma's regulations did not comply with the Plan. It concluded Oklahoma improperly permitted the use of estimated mileage charts which skewed mileage calculations to favor jurisdictions that impose lower fees upon vehicle registrants. The Committee concluded Oklahoma's noncompliance caused Illinois to suffer monetary loss, and directed Illinois and Oklahoma to work together to determine the amount of the loss.

Illinois and Oklahoma were unable to settle on a method for determining a loss amount. In response, the DRC ordered the "Illinois Sanction": it instructed all member jurisdictions to withhold funds from Oklahoma until Oklahoma submitted an acceptable plan to compensate Illinois for its losses. Oklahoma filed suit, alleging the Illinois Sanction was invalid and unenforceable. Oklahoma requested a preliminary injunction to prohibit enforcement of the sanction. The district court granted Oklahoma's request, concluding IRP had authority to decide the dispute, but lacked authority to force the parties to settle. The court determined the Illinois sanction was unauthorized under the Plan because the

---

[3]Prior to the hearing, Oklahoma sued IRP, alleging IRP had failed to promulgate procedural rules which would protect Oklahoma's right to fundamental fairness during the hearing process. The court denied Oklahoma's requests for declaratory and injunctive relief, and the parties agreed to the dismissal of the action.

DRC neither determined the amount Oklahoma owed to Illinois nor issued an appropriate payment order.

In August 2003, thirteen states (the "Joint Jurisdictions") filed a joint dispute with IRP.[4]  Like Illinois, the Joint Jurisdictions claimed they suffered monetary losses as a result of Oklahoma's noncompliance with the Plan.  The DRC considered the Illinois and Joint Jurisdictions disputes together at its November 2003 meeting.  At the time of the November meeting, three of the seven voting members on the DRC, including the Chairman of the Committee, were residents of Joint Jurisdictions states.  Fearing bias, Oklahoma moved for the recusal of members from Joint Jurisdictions states, but the DRC denied its motion.

C.    *The November 2003 and April 2004 DRC Meetings*

At the November 2003 meeting, two expert witnesses presented competing methodologies for calculating the amount of loss caused by Oklahoma's noncompliance with the Plan.  One expert witness testified on behalf of Illinois and the Joint Jurisdictions, while the other testified on behalf of Oklahoma.  The Committee, which included the three members from the Joint Jurisdiction states, voted to accept the loss analysis presented by the Illinois and Joint Jurisdictions

---

[4]The Joint Jurisdictions originally included Alabama, California, Colorado, Indiana, Iowa, Kansas, Michigan, Minnesota, Missouri, Montana, Nebraska, Nevada, and South Dakota.  Montana and South Dakota later dropped their claims against Oklahoma.

expert. The Committee approved motions accepting the Illinois and Joint Jurisdictions claim amounts, subject to certain adjustments.

In later conference call meetings, the DRC considered the parties' positions on adjustments to the claim amounts. Ruth Skluzacek, a DRC member from a Joint Jurisdiction state and a member of the Board, chaired the meetings. At the same time, Skluzacek acted as an advocate for the Joint Jurisdictions in their claim against Oklahoma. At the time of the conference call meetings, two voting members of the DRC were from Joint Jurisdiction states, and one voting member was from Illinois. Oklahoma moved to recuse these three voters, but again its request was denied.

In its April 2004 meeting, the DRC approved a series of motions concerning the Illinois and Joint Jurisdictions claims. The committee determined Oklahoma must pay $6,340,234.24 to Illinois and $22,175,915.35 to the Joint Jurisdictions, along with interest and potential penalties. The DRC member from Illinois abstained from voting on the motion to establish the amount due to Illinois, and the motion passed on a three to two vote. Representatives from the Joint Jurisdictions did not abstain during voting on the motion to establish the amount due to the Joint Jurisdictions. That motion passed on a four to two vote. Other motions pertaining to the Illinois and Joint Jurisdictions claims passed unanimously. The Board later affirmed the DRC's actions, although it postponed the effective date of the penalties.

*D.     Oklahoma's Amended Complaint and Motion for Preliminary Injunction*

After the DRC's April meeting, Oklahoma amended its complaint. Oklahoma contested the DRC's November 2003 and April 2004 decisions relating to the Illinois and Joint Jurisdictions claims. Oklahoma alleged it was entitled to fundamentally fair hearings before the DRC, and claimed it failed to receive such hearings because the DRC members from Illinois and the Joint Jurisdictions were not impartial decision-makers. Oklahoma moved for a preliminary injunction to prohibit the IRP from enforcing the November and April decisions. Oklahoma did not seek substantive review of the DRC's November and April decisions. The only question before the district court was "whether the procedures followed by the DRC in reaching its . . . decisions were so flawed as to invalidate those decisions and warrant the issuance of a preliminary injunction precluding their enforcement." *State of Okla. ex rel. Okla. Tax Comm'n. v. Int'l Registration Plan, Inc.*, No. CIV-02-1798-HE, slip op. at 8 (W.D. Okla. Sept. 3, 2004).

The district court found DRC voting members from the Joint Jurisdictions, particularly member Skluzacek, were *not* disinterested individuals. *Id.* at 11. It observed members from Joint Jurisdiction states "could not properly have acted as judges or third party decision-makers" in an administrative or judicial context. *Id.* Nonetheless, in the context of the Plan, the district court concluded participation of members from Joint Jurisdictions states, even though they were

not disinterested, did not render the DRC proceedings and decisions fundamentally unfair. The district court refused Oklahoma's motion for a preliminary injunction, concluding Oklahoma was not likely to succeed on the merits of its claim and determining Oklahoma did not show an injunction would serve the public interest. Oklahoma appeals the district court's decision.

## III. ANALYSIS

### A.    Jurisdiction Under the TIA

As a threshold matter, this court must determine whether the TIA bars federal court jurisdiction over this dispute. The TIA provides that "the [federal] district courts shall not enjoin, suspend or restrain the assessment, levy or collection of any tax under State law where a plain, speedy and efficient remedy may be had in the courts of such State." 28 U.S.C. § 1341. The Supreme Court has characterized the TIA as a "broad jurisdictional barrier." *Arkansas v. Farm Credit Servs. of Cent. Ark.*, 520 U.S. 821, 825 (1997) (quotation omitted). It is "a vehicle to limit drastically federal district court jurisdiction to interfere with so important a local concern as the collection of taxes." *Id*. at 826 (quotations omitted). Although neither Oklahoma nor IRP raised the issue, this court was concerned the TIA may preclude federal court jurisdiction over Oklahoma's claim. Because federal appellate courts must satisfy themselves of their own jurisdiction even when parties do not contest it, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986), we requested supplemental briefing from

Oklahoma and IRP on the reach of the TIA's jurisdictional bar. After reviewing the parties' arguments, we hold Oklahoma's claim is not barred by the TIA because the relief requested would not impair Illinois' and the Joint Jurisdictions' assessment, levy, or collection of state tax revenue.

The TIA may apply to a lawsuit when the relief granted by a federal court will "operate[ ] to reduce the flow of state tax revenue." *Hibbs v. Winn*, 542 U.S. 88, 106 (2004). In this action, Oklahoma seeks to enjoin decisions rendered by the DRC in its November 2003 and April 2004 meetings. These decisions require Oklahoma to compensate Illinois and the Joint Jurisdictions for monies Oklahoma collected as a base jurisdiction, but failed to distribute properly. If successful, Oklahoma concedes its suit will reduce the flow of revenue to Illinois and the Joint Jurisdictions. To determine whether the TIA applies, however, this court must decide whether the relief sought by Oklahoma would reduce the flow of *state tax* revenue for purposes of the TIA.

Under the Plan, vehicle-registration revenue reaches member jurisdictions in a two-stage process. In the first stage, a base jurisdiction collects assessments from vehicle registrants. These assessments *may* constitute state tax revenue, and therefore a dispute involving this stage of the process *may* be subject to the TIA.[5]

_____

[5]In the alternative, assessments collected from vehicle registrants could be regulatory fees instead of taxes; regulatory fees are not subject to the TIA. *See Marcus v. Kan. Dep't of Revenue*, 170 F.3d 1305, 1311 (10th Cir. 1999). To determine whether a particular assessment is a tax or a regulatory fee, a court "focuses on the purpose of the assessment and the ultimate use of the funds." *Id.*

Once a base jurisdiction has collected assessments from vehicle registrants, however, the tax collection process is over. *See* Int'l Registration Plan, art. I, § 109 (noting a registrant's responsibility to pay individual member jurisdictions ends once that registrant has paid a fee to the base jurisdiction). In the second stage of the process, a base jurisdiction merely apportions and distributes the assessments it has collected to other member states and provinces according to the Plan. *See* Int'l Registration Plan, art. III, § 300. The second stage involves administration of the Plan, not collection, assessment, or levy of state tax revenue. Therefore, disputes concerning only the second stage of the process, such as the instant case, do not affect state tax revenue and cannot be subject to the TIA.

### B. Denial of Preliminary Injunction

Oklahoma claims the district court erred when it denied Oklahoma's motion for a preliminary injunction. This court reviews a district court's denial of a motion for a preliminary injunction for abuse of discretion. *Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005). "The standard for abuse of discretion is high." *Id.* (quotation omitted). An appellant must show the district court made an error of law or committed clear error in its factual findings, or that

---

Because determining whether the assessments collected by Oklahoma and used in Illinois and the Joint Jurisdictions are taxes or regulatory fees is not necessary to resolve the issue before us, this court expresses no opinion on the matter.

its judgment was "arbitrary, capricious, whimsical, or manifestly unreasonable." *Id*. (quotation omitted).

A moving party must satisfy a four-part test to merit a preliminary injunction under Rule 65 of the Federal Rules of Civil Procedure. *Id*. It must establish (1) it will suffer irreparable injury unless the injunction issues, (2) the threatened injury outweighs any damage the proposed injunction may cause the opposing party, (3) if issued, the injunction would not be adverse to the public interest, and (4) it has a substantial likelihood of success on the merits. *Id*. If a movant can show the first three requirements "tip strongly in his favor, the test is modified." *Davis v. Mineta*, 302 F.3d 1104, 1111 (10th Cir. 2002). In such situations, the moving party "may meet the requirement for showing success on the merits by showing that questions going to the merits are so serious, substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more deliberate investigation."[6] *Id*. (quotation omitted).

"[O]rdinarily, when an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal." *Solantic, LLC v. City of Neptune*

---

[6]*But cf. O'Centro Espirita Beneficiente Uniao do Vegetal v. Ashcroft*, 389 F.3d 973, 975–76 (10th Cir. 2004) (en banc) (holding the modified test does not apply if the requested preliminary injunction is one of three disfavored types). Because, as set forth more fully below, Oklahoma cannot meet even the modified test, there is no need to determine whether the preliminary injunction sought here is one of the disfavored types.

*Beach*, 410 F.3d 1250, 1272 (11th Cir. 2005) (quotation omitted). Nevertheless, "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance, that ruling may be reviewed even though the appeal is from the entry of a preliminary injunction." *Thornburgh v. Am. Coll. of Obstetricians & Gynecologists*, 476 U.S. 747, 757 (1986), *overruled on other grounds by Planned Parenthood of Se. Pa. v. Casey*, 505 U.S. 833 (1992). In such cases, a decision on the merits underlying the grant or denial of a preliminary injunction may also be beneficial because it "substantially further[s] the interests of judicial economy." *Solantic*, 410 F.3d at 1274. The instant case presents such a situation. Oklahoma's sole claim is that adjudication procedures used by the DRC require fundamental fairness and inherent in fundamental fairness is a neutral decision-maker. The issue is purely legal, the facts are not in dispute, and immediate resolution may avoid wasteful future litigation. Given these unique circumstances presented by this case, we conclude a judgment on the merits is appropriate.[7]

Oklahoma argues it is entitled to "fundamental fairness" in the course of DRC proceedings. Fundamental fairness, it contends, requires that disputes between Plan member jurisdictions be resolved by disinterested decision-makers.

---

[7]Other circuit courts of appeal have reached the merits in cases that have come before them on interlocutory appeal from a district court's grant or denial of a preliminary injunction. *See Solantic, LLC v. City of Neptune Beach*, 410 F.3d 1250, 1273–74 n. 20 (11th Cir. 2005) (noting cases from Second, Third, Sixth, Seventh, and Eighth Circuits).

Because the district court determined Oklahoma's evidence "clearly established that the DRC's decisions were not made by disinterested individuals," *Int'l Registration Plan, Inc.*, No. CIV-02-1798-HE, slip op. at 11, Oklahoma argues the proceedings were not fundamentally fair, and thus argues it has established a substantial likelihood of success on the merits.

At the outset, Oklahoma fails to establish it is entitled to fundamental fairness in the context of dispute resolution under the Plan. Neither the Plan nor the charter establishing the DRC explicitly requires fundamental fairness in dispute resolution proceedings.[8] Oklahoma concedes that, as a State, it is not protected by the Due Process Clause of the Fifth Amendment. *See South Carolina v. Katzenbach*, 383 U.S. 301, 323–24 (1966). It further concedes no controlling authority establishes a right to fundamental fairness in the DRC context. Accordingly, Oklahoma's purported right to fundamental fairness must arise from some other source. Oklahoma argues the Supreme Court's opinion in *City of New York v. New York, N.H. & H.R. Co.* created a right of fundamental fairness in DRC proceedings. 344 U.S. 293 (1953).

---

[8]The Plan and the charter establishing the DRC explicitly provide for notice and a right to be heard. Under the section of the Plan dealing with dispute resolution, the Board is required "to provide for a public notice of all meetings and allow all interested parties to attend and be heard." The DRC charter requires the DRC Chairman to provide interested parties the opportunity to "provide testimony, comment, fact or their views on issues under consideration by the Committee." Neither the Plan nor the charter contains an explicit provision requiring DRC members to be neutral or disinterested.

-13-

The dispute in *City of New York* arose in the context of a railroad's reorganization under the Bankruptcy Act. *Id*. at 294. The Bankruptcy Act required a judge to "cause reasonable notice of the period by which claims may be filed" by creditors. *Id*. at 296 (quotation omitted). The district court handling the railroad's reorganization ordered creditors to file their claims by a specified date. *Id*. at 294. It required the railroad to mail copies of its order to certain creditors, but other creditors, including the City of New York, "had to depend for their notice on two once-a-week publications of the order" in daily newspapers. *Id*. Under the circumstances of the case, the Supreme Court held notice by publication did not satisfy the Bankruptcy Act's "reasonable notice" requirement. *Id*. at 296. At the end of its opinion, the Court stated the Bankruptcy Act's notice requirement "embodies *a basic principle of justice—that a reasonable opportunity to be heard must precede judicial denial of a party's claimed rights*." *Id*. at 297 (emphasis added). Oklahoma contends the Court's statement establishes a right to fundamental fairness in the context of dispute resolution under the Plan. We find Oklahoma's argument unpersuasive.

To the extent *City of New York* establishes "a reasonable opportunity to be heard" as a universal principle of justice, the Court made clear such a right applies only to "*judicial* denial of a party's claimed rights." *Id*. (emphasis added). Oklahoma's claimed rights were denied by the DRC, which is not a judicial tribunal. The entitlement therefore does not apply to the instant case.

-14-

Moreover, *City of New York* defines the right at issue narrowly: the Court refers only to "a reasonable opportunity to be heard." *Id*. Oklahoma, however, urges us to conclude the Court's narrow pronouncement established a much broader entitlement to fundamental fairness, including a neutral decision-maker. There is no basis for doing so, and this court will not engage in unwarranted extrapolation. We therefore conclude *City of New York* does not establish a right to fundamental fairness in the context of dispute resolution proceedings under the Plan.

Although Oklahoma claims its right to fundamental fairness in the DRC context is supported by "ample authority," its argument is based almost exclusively on *City of New York*.[9] Because *City of New York* does not establish a right to fundamental fairness in the DRC context, this court is not persuaded Oklahoma is entitled to such a right.

Even if Oklahoma was entitled to fundamental fairness in dispute resolution proceedings, that entitlement does not include the right to a disinterested

---

[9]In its Reply Brief, Oklahoma cites two other cases to support the contention it is entitled to fundamental fairness in the DRC context. First, it references *United States v. State St. Bank & Trust Co.* (*In re Scott Cable Commc'ns, Inc.*), 259 B.R. 536 (D. Conn. 2001). This case merely recapitulates the Supreme Court's holding in *City of New York* and thus adds nothing to Oklahoma's argument. *See State St. Bank & Trust Co.*, 259 B.R. at 543–44. Second, Oklahoma cites a case from the Illinois Appellate Court, which notes the Illinois Supreme Court has recognized a union member subjected to union disciplinary proceedings is entitled to "essential rights," including a fair and impartial tribunal. *Sheet Metal Workers Local Union No. 218 v. Massie*, 627 N.E. 2d 1154, 1158 (Ill. App. 1993). Oklahoma does not explain why this court should apply Illinois state labor law to dispute resolution proceedings under the Plan, and we see no reason to extend the concept of "essential rights" to this context.

decision-maker in the unique context of the Plan. The structure of the DRC charter makes clear member jurisdictions did not agree to resolve their disputes using neutral, third-party decision-makers. Instead, member jurisdictions agreed to resolve disputes using a committee comprised of members from participating jurisdictions, who were bound to have an interest in the outcome of disputes. Moreover, as the district court pointed out, the structure of the Committee did not permit decision-making by disinterested parties in this dispute, because all potential decision-makers had an interest in the outcome.

If member jurisdictions intended to have neutral decision-makers resolve disputes arising under the Plan, they could have specified a method that would have done so. For example, member jurisdictions could have agreed to bring their disputes before courts of law or use arbitration to settle their differences. Both judicial and arbitration proceedings are characterized by the existence of neutral third-party decision-makers. *See, e.g.*, *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000) (noting a judge must recuse herself if a reasonable person would question her impartiality); *Bowles Fin. Group, Inc. v. Stifel, Nicolaus & Co.*, 22 F.3d 1010, 1013 (10th Cir. 1994) (observing arbitration requires, *inter alia*, a decision-maker not infected with bias).

Member jurisdictions, however, did not elect to use these mechanisms of dispute resolution. Instead, in adopting the DRC charter, they agreed to resolve disputes using a committee with seven voting members. Voting members of the

-16-

DRC consist of two representatives of the Board, four representatives from different regions of the American Association of Motor Vehicles Administrators, and one representative from a Canadian jurisdiction.  Int'l Registration Plan, Dispute Resolution Committee Charter, § III.  In other words, member jurisdictions agreed to have disputes decided by persons with an interest in the operation and administration of the Plan, not neutral third parties.  In adopting this form of dispute resolution, member jurisdictions must have expected—and accepted—that representatives from different regions might carry with them certain biases and or predispositions.  Thus, unlike an adjudication in a court of law or by an arbitration panel, decision-making by a disinterested third-party is not a fundamental characteristic of the dispute resolution structure agreed to by member jurisdictions.

In fact, under the terms of the DRC charter, decision-making by disinterested parties would not be possible in cases where all potential decision-makers have a stake in the outcome of a dispute.  As the district court noted, earlier proceedings in this case presented just such a situation.  *See Int'l Registration Plan, Inc.*, No. CIV-02-1798-HE, slip op. at 14–15.  In Illinois' original Class 1 dispute, the DRC determined Oklahoma failed to comply with the Plan by using estimated mileage charts that skewed calculations in such a way as to benefit lower-fee jurisdictions.  Accordingly, lower-fee jurisdictions benefitted from Oklahoma's noncompliance with the Plan, while higher-fee jurisdictions

-17-

suffered. In the words of the district court, "[e]ach state or province is either a potential winner or a potential loser from any effort by Oklahoma to fudge the apportionment by skewing the [mileage] chart." *Id*. at 15. The district court concluded no representative of a member jurisdiction could be truly disinterested because each jurisdiction has something to gain or lose from Oklahoma's failure to comply with the Plan. *Id*.

The structure agreed to by member jurisdictions and set forth in the DRC charter simply does not contemplate dispute resolution by disinterested decision-makers. As earlier proceedings in this case illustrate, there are circumstances in which dispute resolution by neutral decision-makers is not even possible under the terms of the DRC charter. To infer a neutral decision-maker is required in DRC proceedings would be inconsistent with the nature of the DRC charter agreed to by member jurisdictions. Accordingly, as a matter of law, we hold there is no right to a disinterested decision-maker in dispute resolution under the Plan.

Because there is no right to a neutral decision-maker in DRC proceedings, Oklahoma cannot demonstrate a substantial likelihood of success on the merits under the traditional version of the four-part preliminary injunction test. Nor can it show it has raised serious, substantial, difficult, or doubtful questions going to the merits under the modified version of the test. *See Davis*, 302 F.3d at 1111. Because Oklahoma fails to satisfy the requirement for showing success on the

merits under either the traditional or modified tests for preliminary injunction, it is not entitled to a preliminary injunction, and we need not address the other prongs of the preliminary injunction test. *See, e.g.*, *Koerpel v. Heckler*, 797 F.2d 858, 866–68 (10th Cir. 1986) (affirming district court's denial of plaintiff's motion for preliminary injunction after assuming plaintiff satisfied three requirements of the preliminary injunction test but concluding plaintiff could not meet even modified version of the success on the merits prong).

## IV. Conclusion

For the foregoing reasons, we **affirm** the district court's denial of Oklahoma's motion for preliminary injunction.