[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
MAY 31, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12758

_____

D. C. Docket No. 04-00040-CV-J-25-MMH

SOLANTIC, LLC,
a foreign limited liability company,

Plaintiff-Appellant,

versus

CITY OF NEPTUNE BEACH, a municipality,
ENFORCEMENT BOARD OF THE CITY OF NEPTUNE BEACH,
its local administrative governmental body,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(May 31, 2005)

Before MARCUS, FAY  and SILER[*], Circuit Judges.

MARCUS, Circuit Judge:

_____

[*]Honorable Eugene E. Siler, Jr., United States Circuit Judge for the Sixth Circuit, sitting by designation.

At issue in this case is the constitutionality of the City of Neptune Beach's sign code. Appellant Solantic, LLC ("Solantic") argues that the sign code violates the First Amendment in at least two ways: first, it exempts from regulation certain categories of signs based on their content, without compelling justification for the disparate treatment; and second, it contains no time limits for permitting decisions. We agree with Solantic, and hold the sign code unconstitutional on both grounds.

I.

Solantic is a business operating emergency medical care facilities in various locations, including the City of Neptune Beach ("the City" or "Neptune Beach"). In April 2003, Solantic installed in front of its Neptune Beach facility a large "Electronic Variable Message Center" (EVMC) sign. A videotape showing the sign was viewed by the district court and is part of the record. The district court describes the EVMC sign as sitting in the middle of a pole, approximately 10 to 12 feet above the ground, and situated below a larger blue sign displaying Solantic's business name.

Solantic states that the EVMC sign "was used for, and is intended to be used for, commercial messages, i.e. to identify Solantic's business and to convey information about its products and services, and for noncommercial messages, i.e. to promote social and health ideas and causes." Br. at 4. As the City describes it,

2

Solantic's EVMC sign conveyed "electronically lit messages that flashed, blinked and scrolled across the surface of the sign." Br. at 1.

Prior to erecting the sign, Solantic obtained an electrical permit from the City to operate the sign. Solantic did not, however, submit to the City a sign application, despite the sign code's[1] general requirement that no sign be erected without first obtaining a permit.

Consequently, on April 28, 2003, the City sent Solantic a notice of violations of various sections of the sign code, including § 27-579 (requiring a permit to erect a sign); § 27-581(4) (prohibiting signs with any "visible movement achieved by electrical, electronic or mechanical means, except for traditional barber poles"); § 27-581(5) (prohibiting signs "with the optical illusion of movement by means of a design that presents a pattern capable of giving the illusion of motion or changing of copy"); and § 27-581(6) (prohibiting signs "with lights or illuminations that flash, move, rotate, scintillate, blink, flicker, or vary intensity or color except for time-temperature-date signs"). The notice also informed Solantic that violations of the sign code are punishable by fines of up to $250 a day, or $500 a day for repeat violations.

The City's Code Enforcement Board ("the Board") conducted a hearing on

---

[1]References to the "sign code" are to Section 27, Article XV of the City of Neptune Beach Code of Ordinances.

3

June 11, 2003, and determined that Solantic's sign violated the sign code. The Board subsequently directed Solantic, in an undated order, to cure the violation by taking four steps: (1) obtaining a sign permit; (2) modifying the sign to change copy no more than once a day; (3) modifying the sign so that its copy would not blink, flash, or scroll, but rather would permanently glow; and (4) controlling the sign only from the premises on which it was located.

Following the Board's June decision, Solantic applied for a sign permit. The district court concluded, however, that Solantic appeared to have continued to operate its sign without modifying it in accordance with the City's order.

Thus, on September 24, 2003, the City sent Solantic another notice of alleged violation of the same sections of the sign code. The Board held another hearing on October 8, 2003, after which it issued another undated order reiterating that Solantic was in violation of the sign code in three ways: by allowing the sign to change copy more than once a day; by allowing the sign to blink, flash, or scroll alternating messages; and by not controlling the sign solely from the property on which it was located. The Board thus ordered that Solantic be assessed fines totaling $75 per day ($25 for each of the three violations), running from September 3, 2003 ("the date of discovery or verification or violation(s)") until all violations were cured.

On October 28, 2003, Solantic filed an application for appeal from both the June and the October decisions of the Board. The City denied the appeal on November 3, 2003. Solantic then brought suit in the Circuit Court for the Fourth Judicial Circuit in Duval County, Florida, on January 5, 2004. Soon thereafter, the City removed the case to the United States District Court for the Middle District of Florida.

In its second amended complaint (the operative pleading for purposes of this appeal), filed March 9, 2004, Solantic argued that the sign code violated the First Amendment in a variety of ways, including as a content-based regulation of speech and as an unlawful prior restraint.[2] Solantic sought declaratory relief, in the form of a judgment declaring the City's sign code to be unconstitutional and unenforceable against Solantic, and absolving Solantic of any liability for accrued fines based on alleged violations of the sign code. In addition, Solantic sought preliminary and permanent injunctive relief enjoining enforcement of the sign code.

On March 10, 2004, Solantic moved for a preliminary injunction. The district court held a provisional hearing on April 2, 2004, and ruled on May 3,

---

[2]Solantic also argued that the sign code violated analogous provisions of the Florida Constitution and raised a promissory estoppel claim, based on the City's grant of an electrical permit for Solantic's EVMC sign. These claims have been abandoned on appeal.

2004. The district court denied the preliminary injunction solely on the ground that Solantic had not shown a likelihood of success on the merits, without reaching the other relevant factors.[3] The court reasoned that although the sign code's permit requirement was a prior restraint on speech, it was a content-neutral time, place, and manner restriction that did not place excessive discretion in the hands of licensing officials, and was therefore constitutional.

It is from this order that Solantic took an interlocutory appeal, pursuant to 28 U.S.C. § 1292(a)(1).

## II.

## A.

The decision to grant or deny a preliminary injunction "is within the sound discretion of the district court and will not be disturbed absent a clear abuse of discretion." Palmer v. Braun, 287 F.3d 1325, 1329 (11th Cir. 2002); see also, e.g., Horton, 272 F.3d at 1326; Siegel v. LePore, 234 F.3d 1163, 1178 (11th Cir. 2000). We review the district court's findings of fact for clear error, and its application of the law de novo, "premised on the understanding that '[a]pplication of an improper

---

[3]Preliminary injunctive relief may be granted if the moving party establishes: (1) a substantial likelihood of success on the merits of the underlying case; (2) that he will suffer irreparable harm unless an injunction issues; (3) that the harm he will suffer without an injunction outweighs the harm the injunction would cause the opposing party; and (4) that an injunction would not disserve the public interest. See, e.g., Horton v. City of St. Augustine, 272 F.3d 1318, 1326 (11th Cir. 2001); Johnson & Johnson Vision Care, Inc. v. 1-800 Contacts, Inc., 299 F.3d 1242, 1246-47 (11th Cir. 2002).

legal standard . . . is never within a district court's discretion.'" Johnson &

Johnson, 299 F.3d at 1246 (quoting Am. Bd. of Psychiatry & Neurology, Inc. v.

Johnson-Powell, 129 F.3d 1, 3 (1st Cir. 1997)); see also Horton, 272 F.3d at 1326.[4]

Solantic argues that the district court abused its discretion in denying

preliminary injunctive relief, since Neptune Beach's sign code violates the First

Amendment in three ways: first, the enumerated exemptions from its regulations

render it an unconstitutional content-based restriction on speech; second, its permit

requirement is an unlawful prior restraint; and third, it is unconstitutionally vague

as applied to Solantic. Because we agree with Solantic as to the first two issues,

we need not and do not reach the third.

In determining whether the district court correctly concluded that Solantic

was unlikely to succeed on the merits, we review the relevant provisions of the

Neptune Beach sign code in some detail. The sign code regulates all signs erected

---

[4]The district court has substantial discretion in weighing the four relevant factors to determine whether preliminary injunctive relief is warranted. As we have explained previously:

> This limited [abuse of discretion] review is necessitated because the grant or denial of a preliminary injunction is almost always based on an abbreviated set of facts, requiring a delicate balancing of the probabilities of ultimate success at final hearing with the consequences of immediate irreparable injury which could possibly flow from the denial of preliminary relief. Weighing these considerations is the responsibility of the district court.

Siegel, 234 F.3d at 1178 (quoting Revette v. Int'l Ass'n of Bridge, Structural & Ornamental Iron Workers, 740 F.2d 892, 893 (11th Cir. 1984) (citation omitted)). However, the district court made no such calculus in this case.

within the City, other than those that are explicitly exempted from its regulations. See § 27-572 ("This article exempts certain signs from these regulations . . . ."); § 27-573 ("This article applies to all signs, and other advertising devices, that are constructed, erected, operated, used, maintained, enlarged, illuminated or substantially altered within the city."); § 27-580 (enumerating exempt signs).

At the outset, the sign code contains a number of findings of fact, pertaining to the safety and aesthetic harms that signs may cause. These findings state:

(1)     The manner of the erection, location and maintenance of signs affects the public health, safety, morals, and welfare of the people of this community.

(2)     The safety of motorists, cyclists, pedestrians, [and] other users of the public streets is affected by the number, size, location, lighting and movement of signs that divert the attention of drivers.

(3)     The size and location of signs may, if uncontrolled, constitute an obstacle to effective fire-fighting techniques.

(4)     The construction, erection and maintenance of large signs suspended from or placed on the tops of buildings, walls or other structures may constitute a direct danger to pedestrian and vehicular traffic below, especially during periods of strong winds.

(5)     Uncontrolled and unlimited signs may degrade the aesthetic attractiveness of the natural and manmade attributes of the community and thereby undermine the economic value of tourism, visitation and permanent economic growth.

§ 27-574.

8

In light of these findings of fact, the sign code lays out the "intentions and purposes of the city council" in enacting it:

(1)   To create a comprehensive and balanced system of sign control that accommodates both the need for a well-maintained, safe and attractive community, and the need for effective business identification, advertising and communication.

(2)   To permit signs that are:

    a.   Compatible with their surroundings.

    b.   Designed, constructed, installed and maintained in a manner which does not endanger public safety or unduly distract motorists.

    c.   Appropriate to the type of activity to which they pertain.

    d.   Large enough to convey sufficient information about particular property, the products or services available on the property, or the activities conducted on the property, and small enough to satisfy the needs for regulation.

    e.   Reflective of the identity and creativity of individual occupants.

(3)   To promote the economic health of the community through increased tourism and property values.

§ 27-575.

A "sign," as broadly defined by the code, "means any device which is used to announce, direct attention to, identify, advertise or otherwise communicate information or make anything known. The term shall exclude architectural

9

features or art not intended to communicate information." § 27-576.

Signs that are regulated by the sign code are subject to a variety of regulations, two of which are particularly important here. First, § 27-579 requires that a permit be obtained before a sign may be erected.[5] Second, § 27-581 establishes numerous limitations on the form that signs may take, including that they may not contain any visible movement, § 27-581(4); they may not create the optical illusion of movement, including by changing copy, § 27-581(5); and they may not contain lights or illuminations that flash, move, rotate, scintillate, blink, flicker, or vary in intensity or color, except for time-temperature-date signs, § 27-

---

[5]This section provides:

(a)     Except as otherwise provided in this article, no sign within the city shall be constructed, erected, operated, used, maintained, enlarged, illuminated, or substantially altered without first obtaining a permit as provided in this section.

(b)     A separate application for a permit shall be made for each separate advertising sign or advertising structure, on a form furnished by the city manager.

(c)     The application for a permit shall describe the size, shape, and nature of the proposed advertisement, advertising sign, or advertising structure, and its actual or proposed locations with sufficient accuracy to ensure its proper identification.

(d)     The application for a permit shall be signed by the applicant or his authorized agent and by the property owner, if different than the property owner, or his authorized agent.

(e)     For multiple occupancy complexes, individual occupants may apply for a sign permit, but they shall be issued in the name of the lot owner or agent, rather than in the name of the individual occupants. The lot owner, and not the city, shall be responsible for allocating allowable sign area to individual occupants.

§ 27-579.

10

581(6), among other things.

However, the sign code expressly exempts from these regulations certain enumerated categories of signs. Two provisions in particular are significant here. First, § 27-580 provides:

> The following types of signs are exempt from these regulations, provided they are not placed or constructed so as to create a hazard of any kind:[6]

---

[6]Neptune Beach suggested for the first time at oral argument that § 27-580 may create an exemption only from the sign code's permitting requirement, not from its other regulations. This argument was never raised in the district court or in Neptune Beach's briefs to this Court, and therefore it is waived. See, e.g., Chapman v. AI Transp., 229 F.3d 1012, 1044 (11th Cir. 2000) ("It is axiomatic that an argument not raised before the trial court or on appeal has been waived."); Marek v. Singletary, 62 F.3d 1295, 1298 n. 2 (11th Cir. 1995) ("Issues not clearly raised in the briefs are considered abandoned.").

But even if this argument were properly before us, we would reject it on the merits, since we find nothing ambiguous about the scope of the sign code's exemptions. Section 27-580 enumerates signs that "are exempt from these regulations." § 27-580. Although the sign code does not explicitly state that the exemption from "these regulations" extends to all sign code regulations, we see no other plausible way to read the ordinance. We can discern no principled basis for determining that the signs § 27-580 declares "exempt from these regulations" are exempt from some of the sign code's regulations but not others. For one thing, the very first provision of the sign code states that the code "exempts certain signs from these regulations." § 27-572. Section 27-580 then enumerates the exempt signs referenced in § 27-572. The language "these regulations" at the beginning of the sign code cannot be read as referring to anything other than all regulations that follow. Moreover, a subsequent provision of the sign code enumerates certain other categories of signs that are exempt from the permit requirement only, see § 27-583(b), reinforcing that § 27-580's more broadly worded exemption applies to the permit requirement and to the sign code's other regulations, including § 27-581's restrictions on form.

In addition, the fact that § 27-580 explicitly states that some of the exempt categories of signs are subject to some of § 27-581's regulations suggests that those exempt categories that are not explicitly subjected to these regulations are indeed exempt from them. For example, § 27-580(5) exempts "[i]ntegral decorative or architectural features of buildings, provided that such features do not contain . . . moving parts or lights." Moving parts and lights are generally prohibited by §§ 27-581(4) and (6), respectively. Similarly, § 27-580(11) exempts merchandise

11

(1)     Signs that are not designed or located so as to be visible from any street or adjoining property.

(2)     Signs of two (2) square feet or less and that include no letters, symbols, logos or designs in excess of two (2) inches in vertical or horizontal dimension, provided that such sign, or combination of such signs, does not constitute a sign prohibited by this Code.

(3)     Flags and insignia of any government, religious, charitable, fraternal, or other organization, provided that:

---

displays in storefront windows, "so long as no part of the display moves or contains flashing lights." Were these enumerated categories of signs exempt only from the sign code's permit requirement, including these explicit applications of other sign code regulations would be wholly unnecessary.

Our practice is to "uphold a state statute against a facial challenge if the statute is readily susceptible to a narrowing construction that avoids constitutional infirmities. We 'will not, however, rewrite the clear terms of a statute in order to reject a facial challenge,' and, as a federal court, 'we must be particularly reluctant to rewrite the terms of a state statute.'" Fla. Right to Life, Inc. v. Lamar, 273 F.3d 1318, 1326 (11th Cir. 2001) (quoting Dimmitt v. City of Clearwater, 985 F.2d 1565, 1572 (11th Cir. 1993)) (citation and footnote omitted). Because any narrowed reading of the sign code's exemptions would require us to rewrite its basic terms by inserting our own limiting language into § 27-580, the sign code is not susceptible to a narrowing construction.

Finally, even if the City were correct that § 27-580's exemptions are from the permit requirement only, the sign code would still present exactly the same constitutional problem. Content-based exemptions from a permitting requirement raise serious questions of constitutionality that remain at the heart of this case. Reading the exemptions as applicable only to the sign code's permit requirement would render them no less content based than if they applied to all of the sign code's regulations. The problem is with the character of the enumerated categories, not with the scope of the exemption. Thus, if we find that the exemptions are content based and fail strict scrutiny, the sign code would be unconstitutional regardless of whether the exemptions are from all of its regulations or from the permit requirement only. The only type of narrowing construction that will save a statute from a constitutional challenge is one "that avoids constitutional infirmities," id. -- something that Neptune Beach's reading, even if correct, does not do.

12

a. No more than three (3) such flags or insignia are displayed on any one parcel of land; and

b. The vertical measurement of any flag does not exceed twenty (20) percent of the total height of the flag pole, or in the absence of a flag pole, twenty (20) percent of the distance from the top of the flag or insignia to the ground.

(4) Signs erected by, on behalf of, or pursuant to authorization of a governmental body, including, but not limited to the following: legal notices, identification signs, and informational, regulatory, or directional signs;

(5) Integral decorative or architectural features of buildings, provided that such features do not contain letters, trademarks, moving parts or lights.

(6) Signs on private premises directing and guiding traffic and parking on private property, but bearing no advertising matter;

(7) Signs painted or attached to trucks or other vehicles for identification purposes.

(8) Official signs of a noncommercial nature erected by public utilities, provided that such signs do not exceed three (3) feet in height and the sign area does not exceed one-half (½) square foot in area.

(9) Decorative flags or bunting for a celebration, convention, or commemoration of significance to the entire community when authorized by the city council for a prescribed period of time.

(10) Holiday lights and decorations.

(11) Merchandise displays behind storefront windows so long as no part of the display moves or contains flashing lights.

(12)   Memorial signs or tablets, names of buildings and dates of erection when cut into any masonry surface or when constructed of bronze or other incombustible materials and attached to the surface of a building.

(13)   Signs incorporated into machinery or equipment by a manufacturer or distributor, which identify or advertise only the product or service dispensed by the machine or equipment, such as signs customarily affixed to vending machines, newspaper racks, telephone booths, and gasoline pumps.

(14)   Public warning signs to indicate the dangers of trespassing, swimming, animals, or similar hazards.

(15)   Works of art that do not constitute advertising.

(16)   Signs carried by a person; and

(17)   Religious displays (e.g. nativity scenes).

§ 27-580.

Second, § 27-583(b) exempts only from the sign code's permit requirement a variety of types of temporary signs.[7]  Exempt signs include:

(1)   On-site for sale/rent/lease signs;

(2)   Grand opening signs;

(3)   Construction-site identification signs;

(4)   Signs to indicate the existence of a new business or business location;

_____

[7]This section provides: "The following temporary signs are permitted without a sign permit, provided that the sign conforms to the requirements set forth below . . . ."  § 27-583(b). The "requirements" referenced include limitations on size and display time, among other things. See id.

14

(5)     On-site signs to announce or advertise such temporary uses as fairs, carnivals, circuses, revivals, sporting events, festivals or any public, charitable, educational or religious event; and

(6)     Election or political campaign related signs.

B.

Solantic says that the sign code is a facially unconstitutional content-based restriction on speech, since it exempts from its regulations some categories of signs, based on their content, but not others. Because most (though not all) of the exemptions from the sign code are based on the content -- rather than the time, place, or manner -- of the message, we are constrained to agree with Solantic that the sign code discriminates against certain types of speech based on content.

In evaluating the constitutionality of an ordinance restraining or regulating speech, "we first inquire whether the Ordinance is content-neutral." Burk v. Augusta-Richmond County, 365 F.3d 1247, 1251 (11th Cir. 2004); see also One World One Family Now v. City of Miami Beach, 175 F.3d 1282, 1286 (11th Cir. 1999) ("It is only if we find the governmental action content neutral that we examine whether the action is a permissible time, place, and manner regulation."). If the ordinance is a content-neutral time, place, and manner restriction, it is subject to intermediate scrutiny -- that is, it must not restrict speech substantially more

15

than necessary to further a legitimate government interest, and it must leave open adequate alternative channels of communication. However, if the ordinance is content based, it is subject to strict scrutiny, meaning that it is constitutional only if it constitutes the least restrictive means of advancing a compelling government interest. Burk, 365 F.3d at 1251 (citations omitted).

As the Supreme Court has explained:

> At the heart of the First Amendment lies the principle that each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Our political system and cultural life rest upon this ideal. Government action that stifles speech on account of its message, or that requires the utterance of a particular message favored by the Government, contravenes this essential right. Laws of this sort pose the inherent risk that the Government seeks not to advance a legitimate regulatory goal, but to suppress unpopular ideas or information or manipulate the public debate through coercion rather than persuasion. These restrictions "rais[e] the specter that the Government may effectively drive certain ideas or viewpoints from the marketplace."

> For these reasons, the First Amendment, subject only to narrow and well-understood exceptions, does not countenance governmental control over the content of messages expressed by private individuals. Our precedents thus apply the most exacting scrutiny to regulations that suppress, disadvantage, or impose differential burdens upon speech because of its content. . . . In contrast, regulations that are unrelated to the content of speech are subject to an intermediate level of scrutiny, because in most cases they pose a less substantial risk of excising certain ideas or viewpoints from the public dialogue.

Turner Broad. Sys., Inc. v. FCC, 512 U.S. 622, 641-42, 114 S. Ct. 2445, 129 L. Ed. 2d 497 (1994) (citations omitted) (quoting Simon & Schuster, Inc. v. Members of

16

State Crime Victims Bd., 502 U.S. 105, 116, 112 S. Ct. 501, 508, 116 L. Ed. 2d 476 (1991)); see also Police Dep't of the City of Chicago v. Mosley, 408 U.S. 92, 95, 92 S. Ct. 2286, 33 L. Ed. 2d 212 (1972) ("[A]bove all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content."); R.A.V. v. City of St. Paul, 505 U.S. 377, 382, 112 S. Ct. 2538, 120 L. Ed. 2d 305 (1992) ("Content-based regulations are presumptively invalid.").

The Supreme Court has articulated and applied various standards for determining whether a law is content based or content neutral. "As a general rule, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content based." Turner, 512 U.S. at 643. On the other hand, a content-neutral ordinance is one that "places no restrictions on . . . either a particular viewpoint or any subject matter that may be discussed." Hill v. Colorado, 530 U.S. 703, 723, 120 S. Ct. 2480, 147 L. Ed. 2d 597 (2000); see also Burk, 365 F.3d at 1254 (A content-neutral ordinance "applies equally to all, and not just to those with a particular message or subject matter in mind.").[8]

---

[8]The City also cites Ward v. Rock Against Racism, 491 U.S. 781, 109 S. Ct. 2746, 105 L. Ed. 2d 661 (1989), in which the Supreme Court took a somewhat different approach to evaluating content neutrality, explaining:

The principal inquiry in determining content neutrality, in speech cases generally and in time, place, or manner cases in particular, is whether the government has adopted a regulation of speech because of disagreement with the message it

17

In determining whether the Neptune Beach sign code's series of enumerated exemptions render it content based, we are guided by the Supreme Court's plurality opinion in <u>Metromedia, Inc. v. City of San Diego</u>, 453 U.S. 490, 101 S. Ct. 2882, 69 L. Ed. 2d 800 (1981), and by our own opinion in <u>Dimmitt v. City of Clearwater</u>, 985 F.2d 1565 (11th Cir. 1993).[9] In <u>Metromedia</u>, the Court addressed

conveys. The government's purpose is the controlling consideration. A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others. Government regulation of expressive activity is content neutral so long as it is "<u>justified</u> without reference to the content of the regulated speech."

<u>Id.</u> at 791 (citations omitted) (quoting <u>Clark v. Cmty. for Creative Non-Violence</u>, 468 U.S. 288, 293, 104 S. Ct. 3065, 82 L. Ed. 2d 221 (1984)).

However, more recently, the Court has receded from this formulation, returning to its focus on the law's own terms, rather than its justification, in <u>City of Cincinnati v. Discovery Network, Inc.</u>, 507 U.S. 410, 113 S. Ct. 1505, 123 L. Ed. 2d 99 (1993). In <u>Discovery Network</u>, the Court held that a city ordinance banning news racks containing commercial handbills but allowing news racks containing noncommercial newspapers was an unconstitutional content-based restriction on speech. The city contended that its interests in safety and aesthetics (its proffered justifications for the ordinance) served an interest unrelated to the content of the prohibited publications, rendering the ordinance content neutral. The Court, however, found this argument "unpersuasive because the very basis for the regulation is the difference in content between ordinary newspapers and commercial speech. True, there is no evidence that the city has acted with animus toward the ideas contained in respondents' publications, but just last Term we expressly rejected the argument that 'discriminatory . . . treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas.'" <u>Id.</u> at 429 (quoting <u>Simon & Schuster, Inc. v. Members of the N.Y. State Crime Victims Bd.</u>, 502 U.S. 105, 117, 112 S. Ct. 501, 116 L. Ed. 2d 476 (1991)). Accordingly, the Court held: "Under the city's newsrack policy, whether any particular newsrack falls within the ban is determined by the content of the publication resting inside that newsrack. Thus, by any commonsense understanding of the term, the ban in this case is 'content based.'" <u>Id.</u>

[9]In <u>City of Ladue v. Gilleo</u>, 512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994), the Supreme Court "identif[ied] two analytically distinct grounds for challenging the constitutionality of a municipal ordinance regulating the display of signs. One is that the measure in effect restricts too little speech because its exemptions discriminate on the basis of

18

the constitutionality of a San Diego ordinance that banned outdoor signs generally

(to promote traffic safety and aesthetics), but exempted from the ban certain

categories of signs.

A majority of the Court agreed that the ordinance was constitutional insofar

as it banned offsite commercial advertising while continuing to allow onsite

commercial advertising, since the city could permissibly distinguish between types

_____

the signs' messages." Id. at 50-51 (citing the Metromedia plurality opinion). "Alternatively, such provisions are subject to attack on the ground that they simply prohibit too much protected speech." Id. at 51 (citing the Metromedia concurring opinion).

Ladue involved a challenge to a ban on all residential signs other than those falling within one of ten enumerated exemptions, brought by a homeowner seeking to display in her window a sign reading, "Say No to War in the Persian Gulf, Call Congress Now." Instead of looking first to whether the sign ordinance's exemptions were content based, the Court employed the following approach:

> [W]e first ask whether Ladue may properly prohibit Gilleo from displaying her sign, and then, only if necessary, consider the separate question whether it was improper for the City simultaneously to permit certain other signs. In examining the propriety of Ladue's near-total prohibition of residential signs, we will assume, arguendo, the validity of the City's submission that the various exemptions are free of impermissible content or viewpoint discrimination.

Id. at 53. The Court concluded that the city could not constitutionally prohibit the display of Gilleo's sign, reasoning that yard and window signs are "a venerable means of communication," id. at 54, and "may have no practical substitute," id. 57. The Court thereby avoided reaching the question of the constitutionality of the ordinance's exemptions.

Here, we cannot avoid the second question. Neptune Beach has not sought to prohibit Solantic's sign, but rather to subject it to a variety of regulations. We have no doubt that a city may permissibly impose permitting requirements, form restrictions, and other limitations on signs. Thus, we cannot avoid proceeding to the next inquiry -- that is, whether subjecting some signs but not others to these regulations amounts to impermissible content discrimination. We must, therefore, look beyond Ladue to the Court's approach in Metromedia and our opinion in Dimmitt.

of commercial speech. Metromedia, 453 U.S. at 507-12 (plurality opinion); id. at 541 (Stevens, J., dissenting in part). However, both the four-Justice plurality opinion written by Justice White and the two-Justice concurrence written by Justice Brennan concluded that the ordinance's regulation of noncommercial advertising was unconstitutional -- although for wholly different reasons. The plurality found the ordinance unconstitutional in two ways. First, the ordinance continued to allow on-site commercial advertising, while banning on-site noncommercial advertising, which impermissibly favored commercial over noncommercial speech. Id. at 512-13 (plurality opinion). Second -- and most relevant to Solantic's case -- the plurality concluded that the ordinance's series of exemptions from its general sign ban amounted to impermissible content-based discrimination among types of noncommercial speech. Id. at 514.

The ordinance exempted religious symbols, commemorative plaques of recognized historical societies and organizations, signs carrying news items or telling the time or temperature, signs erected in discharge of any governmental function, and temporary political campaign signs. By exempting these categories of signs, the plurality reasoned, the ordinance "distinguishes in several ways between permissible and impermissible signs at a particular location by reference to their content." Id. at 516. The plurality explained that "[w]ith respect to

20

noncommercial speech, the city may not choose the appropriate subjects for public discourse: 'To allow a government the choice of permissible subjects for public debate would be to allow that government control over the search for political truth.'" Id. at 515 (quoting Consol. Edison Co. of N.Y. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 530, 538, 100 S. Ct. 2326, 65 L. Ed. 2d 319 (1980)). It thus found the ordinance invalid.

Justice Brennan, writing for himself and Justice Blackmun, also concluded that the ordinance was unconstitutional, but not because of its exemptions. Instead, the concurrence analyzed the ordinance as a total ban on signs, explaining that, in contrast to the plurality "my view is that the practical effect of the San Diego ordinance is to eliminate the billboard as an effective medium of communication for the speaker who wants to express the sorts of messages [not exempted], and that the exceptions do not alter the overall character of the ban." Id. at 525-26 (Brennan, J., concurring in the judgment). Accordingly, the concurrence applied "the tests this Court has developed to analyze content-neutral prohibitions of particular media of communication" to conclude that the ban was invalid. Id. at 526-27.

Because the Metromedia plurality's constitutional rationale did not garner

21

the support of a majority, it has no binding application to Solantic's case.[10]

However, we subsequently adopted the same reasoning in Dimmitt v. City of

Clearwater. In Dimmitt, a panel of this Court addressed an ordinance very similar

to Neptune Beach's, striking it down as a facially unconstitutional content-based

restriction on speech. The Clearwater ordinance required a permit to erect or alter

a sign, but exempted from this requirement certain types of signs, including: flags

---

[10]From the fractured decision in Metromedia -- which contained a total of five separate opinions -- there emerges no controlling opinion as to the ordinance's regulation of noncommercial speech, and no subsequent majority of the Supreme Court has ever explicitly adopted or rejected the reasoning of any of the Metromedia opinions. The Supreme Court has explained that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgment on the narrowest grounds.'" Marks v. United States, 430 U.S. 188, 193, 97 S. Ct. 990, 993, 51 L. Ed. 2d 260 (1977) (quoting Gregg v. Georgia, 428 U.S. 153, 169 n. 15, 96 S. Ct. 2909, 2923 n.15, 49 L. Ed. 2d 859 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)). However, "[t]he Supreme Court has not compelled us to find a 'holding' on each issue in each of its decisions. On the contrary, the Court has indicated that there may be situations where even the Marks inquiry does not yield any rule to be treated as binding in future cases." Johnson v. Bd. of Regents of Univ. of Ga., 263 F.3d 1234, 1248 n.12 (11th Cir. 2001) (citing Nichols v. United States, 511 U.S. 738, 114 S. Ct. 1921, 128 L. Ed. 2d 745 (1994)). Metromedia presents just such a case.

Indeed, at least two of our sister Circuits have applied Marks analysis to Metromedia's noncommercial-speech holding and have found no controlling opinion. See Rappa v. New Castle County, 18 F.3d 1043, 1056-61 (3d Cir. 1994); Discovery Network, Inc. v. City of Cincinnati, 946 F.2d 464, 470 n.9 (6th Cir. 1991). As the Third Circuit explained, "the plurality and the concurrence took such markedly different approaches to the San Diego ordinance that there is no common denominator between them." Rappa v. New Castle County, 18 F.3d 1043, 1058 (3d Cir. 1994) (concluding that Metromedia was not controlling in the case before it). Whereas the plurality concluded that the ordinance's exemptions rendered it a content-based speech restriction, the concurrence, in contrast, "did not think that the relevant issue was the constitutional effect of the exceptions to the general prohibition," but rather "viewed the San Diego ordinance as a total ban on billboards because it believed that the ordinance would have the practical effect of eliminating the billboard industry in San Diego and thereby would eliminate billboards as an effective medium of communication." Rappa, 18 F.3d at 1058. Because of these sharp differences, neither opinion has any controlling precedential force.

22

representing a governmental unit or body (limited to two per property), public signs posted by the government, temporary political signs, real estate signs, construction signs, temporary window advertisements, occupant identification signs, street address signs, warning signs, directional signs, memorial signs, signs commemorating public service, stadium signs, certain signs displayed on vehicles, signs commemorating holidays, menus posted outside restaurants, yard sale signs, and signs customarily attached to fixtures such as newspaper machines and public telephones.

The plaintiff -- an automobile dealership seeking to display twenty-three American flags -- brought facial and as-applied challenges to the ordinance. Focusing on the fact that the flag exemption applied only to flags of a governmental body, we found that the ordinance "cannot be treated as a content neutral regulation," since "the display of the American flag or that of the State of Florida would be exempted from the permit process while a flag displaying the Greenpeace logo or a union affiliation would require a permit." Dimmitt, 985 F.2d at 1569.

After finding that the ordinance was content based, we considered whether it was nevertheless justified by a compelling state interest, concluding that the City's asserted interest in aesthetics and traffic safety was "not a compelling state interest

23

of the sort required to justify content based regulation of noncommercial speech."
Id. at 1569-70. Finally, we concluded that even if aesthetics and traffic safety were compelling governmental interests, the ordinance was not narrowly tailored to achieve those ends, since "these asserted interests clearly are not served by the distinction between government and other types of flags." Id. at 1570. We explained that "a municipality may not accomplish its purposes in promoting aesthetics and traffic safety by restricting speech depending upon the message expressed." Id. Thus, we held "that by limiting the permit exemption to government flags, the City has unconstitutionally differentiated between speech based upon its content." Id.[11]

---

[11]We note that the Dimmitt/Metromedia-plurality approach is consistent with the prevailing approach among other Circuits. See, e.g., Nat'l Adver. Co. v. Town of Niagra, 942 F.2d 145, 147 (2d Cir. 1991) (observing that the Second Circuit "has adopted the plurality decision in Metromedia concerning billboard regulation"); Nat'l Adver. Co. v. Town of Babylon, 900 F.2d 551 (2d Cir. 1990) (holding that an ordinance exempting certain signs from a general sign ban was an unconstitutional content-based restriction on speech); Gilleo v. City of Ladue, 986 F.2d 1180 (8th Cir. 1993), aff'd on other grounds, 512 U.S. 43, 114 S. Ct. 2038, 129 L. Ed. 2d 36 (1994) (same); Matthews v. Town of Needham, 764 F.2d 58, 60 (1st Cir. 1985) (same).

Indeed, in Dimmitt, we cited with approval the Ninth Circuit's decision in National Advertising Co. v. City of Orange, 861 F.2d 246 (9th Cir. 1988), which adopted the Metromedia plurality approach. See Dimmitt, 985 F.2d at 1570. City of Orange involved a ban on signs, with a series of enumerated exemptions. The court concluded that "[b]ecause the exceptions to the restriction . . . are based on content, the restriction itself is based on content." Id. at 249. Although the city's proffered interests in aesthetics and traffic safety were substantial, they were not sufficient to justify the content-based ban, and thus the court struck it down. Subsequently, in Desert Outdoor Advertising, Inc. v. City of Moreno Valley, 103 F.3d 814 (9th Cir. 1996), the Ninth Circuit used the reasoning of City of Orange and the Metromedia plurality to strike down a statute exempting certain categories of billboards from a permitting requirement. The court explained: "Because the exemptions [for official notices and directional or informational signs, among other things] require City officials to examine the content of . . . signs to determine

There is little to distinguish the Neptune Beach sign code from the

ordinances at issue in <u>Dimmitt</u> and <u>Metromedia</u>.[12]  Like the exemptions from the

_____

whether the exemption applies, the City's regulation . . . is content-based."  <u>Id.</u> at 820.

Only the Third Circuit has taken a different approach.  In <u>Rappa v. New Castle County</u>, 18 F.3d 1043, 1056-61 (3d Cir. 1994), the court addressed an ordinance generally prohibiting placement of signs within a certain distance of a highway, but exempting designated types of signs from this restriction.  Drawing on Justice Brennan's concurrence in <u>Metromedia</u>, the court adopted a "context-sensitive" test for evaluating the constitutionality of content-based exemptions from sign regulations.  <u>Id.</u> at 1064.  The test provided that "when there is a significant relationship between the content of particular speech and a specific location, the state can exempt speech having that content from a general ban so long as the exemption is substantially related to serving an interest that is at least as important as that served by the ban."  <u>Id.</u> at 1066.  We have found no cases applying the <u>Rappa</u> approach, and we are uncertain how it would work in practice.  At all events, we are guided by our own precedent in <u>Dimmitt</u>.

[12]<u>Dimmitt</u> is much more closely on point than our prior decision in <u>Messer v. City of Douglasville</u>, 975 F.2d 1505 (1992), in which a panel of this Court held that an ordinance exempting certain signs from a city permit requirement was <u>not</u> content based.  The ordinance in <u>Messer</u> exempted "from permitting requirements and/or permit fees" the following signs: (1) one wall sign per building, attached to the side of the building, announcing the business; (2) one real estate "for sale" sign per property; (3) one bulletin board located on religious, public, charitable or educational premises; (4) one construction identification sign; (5) directional traffic signs containing no advertisements.  <u>Id.</u> at 1511.

The <u>Messer</u> Court acknowledged that <u>Metromedia</u> and the Ninth Circuit's decision in <u>City of Orange</u> had invalidated ordinances exempting certain types of signs from a general ban on signs as unconstitutional content-based restrictions on speech.  However, <u>Messer</u> distinguished the Douglasville ordinance on two bases.  First, it stated that a permitting requirement was different from a ban in that it was simply a time, place, and manner regulation, reasoning that since "Messer has not challenged the <u>permit process</u> as an unconstitutional restriction on speech," "the Douglasville sign ordinance stands on a different footing from the complete bans on speech in San Diego and the City of Orange."  <u>Id.</u> at 1513.  Second, the <u>Messer</u> Court observed that Douglasville's "exemptions are much more limited than those in the San Diego or City of Orange ordinances," and contained "no specific exemptions for political, historical, religious, or special event signs."  <u>Id.</u>

Solantic's case is much more closely analogous to <u>Dimmitt</u> than to <u>Messer</u>, and indeed is distinguishable by <u>Messer</u>'s own terms.  For one thing, Solantic <u>has</u> challenged the sign code's permit process as an unconstitutional restraint on speech.  Moreover, unlike in <u>Messer</u>, at issue here is not just a permit requirement, but a whole array of restrictions on the form that

25

Clearwater and San Diego sign regulations, the exemptions contained in Neptune

Beach's sign code -- both § 27-580's exemptions from all regulations, and § 27-

583(b)'s exemptions from the permit requirement -- are largely content based.[13]

Not all of the sign code's exemptions are content based. For example,

exemption (1) for signs not visible from any street or adjoining property, and

exemption (16) for signs carried by a person, are restrictions on sign placement,

not content. Cf. Members of the City Council of Los Angeles v. Taxpayers for

Vincent, 466 U.S. 789, 811, 104 S. Ct. 2118, 80 L. Ed. 2d 772 (1984) (upholding a

Los Angeles ordinance prohibiting posting of signs on public property, reasoning

nonexempt signs may take. Exempt signs can convey their message in virtually any manner --
for example, using flashing lights, moving parts, or any of the other features generally prohibited
by § 27-581 -- as long as they "are not placed or constructed so as to create a hazard of any
kind." § 27-580. Nonexempt signs, in contrast, are subject not only to the permit requirement,
but also to all of the limitations enumerated in § 27-581. Thus, the regulations embodied in
Neptune Beach's sign code reach substantially farther than those in the Douglasville ordinance.

The Douglasville ordinance is further distinguishable because the exemptions from the
Neptune Beach sign code are much more numerous and extensive than Douglasville's. In this
regard, the content-based exemptions in this case are more analogous to those in the San Diego
and City of Orange ordinances the Messer Court distinguished from Douglasville's. Section 27-
580, for example, contains seventeen categories of exemptions, and § 27-583(b) contains another
six, whereas Douglasville's ordinance contained a total of five narrow exceptions. In short,
Dimmitt is much more closely on point than Messer.

[13]The fact that these content-based provisions take the form not of regulations but of
exemptions from regulations is immaterial. As the First Circuit has explained, "when a city's
goal is to reward one type of speech, the necessary effect is that all other types of speech are
penalized. A finding that the motive was to promote, rather than to penalize, a certain type of
speech does not alter this fact." Ackerley Communications of Mass., Inc. v. City of Somerville,
878 F.2d 513, 521 (1st Cir. 1989). For our purposes today, whether these content-based
restrictions are cast as regulations or exemptions is simply a matter of semantics.

26

that "[t]he private citizen's interest in controlling the use of his own property justifies the disparate treatment" of public and private property).  Similarly, exemption (2) for signs smaller than two square feet and containing no letters or symbols larger than two inches pertains only to form, not to content.

However, many of the sign code's exemptions are plainly content based. For example, exemption (3) applies to flags and insignia only of a "government, religious, charitable, fraternal, or other organization."  Thus, a government or religious organization seeking to fly its flag may do so freely, whereas an individual seeking to fly a flag bearing an emblem of his or her own choosing would have to apply for a permit to do so, and would have to abide by all of the restrictions enumerated in § 27-581.  For example, the government tax collector's office could display a flag reading, "Stop Tax Evasion," whereas an individual homeowner could not display a flag saying, "Stop Domestic Violence," since § 27-581(13) prohibits the use of the word "stop" in any nonexempt, nongovernmental sign.

Exemption (4) is also content based, permitting governmental identification signs and informational signs to be freely posted, but requiring an individual or private organization who wishes to post a sign identifying his office or home, for example, to obtain a permit to do so.  Moreover, pursuant to § 27-581, an exempt

governmental sign could contain features such as moving parts or flashing lights, whereas the sign code's general prohibitions on such features, see § 27-581 (4), (6), bar the use of these devices by nonexempt individual and other private signs. Thus, the City government could display a ten-foot-tall sign identifying "City Hall" in blinking lights, whereas § 27-581(6) would prohibit a homeowner from posting even a modestly sized sign using flashing lights to identify "The Smith Residence," for example.

Exemption (6) permits signs on private property to be posted freely if they are for the purpose of "guiding traffic and parking" on the property. Thus, without a permit, a homeowner could post a sign reading, "Parking in Back" and bearing a flashing neon arrow pointing toward the rear of the property, but not a traditional yard sign -- which is recognized as "a venerable means of communication" that "may have no practical substitute," Ladue, 512 U.S. at 54, 57 -- with a political message like "Support Our Troops" or "Bring Our Troops Home."

Indeed, the only political signs exempt from any regulation are those "related to elections, political campaigns, or a referendum," and they are exempt only from the sign code's permit requirement, are limited to four square feet in size in residential areas, and may not be displayed for more than fourteen days prior to and two days after an election. § 27-583(b)(6). Thus, while a "Re-Elect Mayor

28

Smith" yard sign could be posted for a maximum of sixteen days, the illuminated parking sign may remain indefinitely. In other words, a large neon arrow receives more favorable treatment under the sign code than a political sign. Moreover, electioneering signs are the only form of political expression spared from the sign code's permit requirement. To express any political message not directly related to an upcoming election, a would-be speaker must comply with the sign code's permitting rules and all of its other restrictions. Thus, a sign espousing a viewpoint on a salient political issue -- for example, "Reform Medicare," "Save Social Security," "Abolish the Death Penalty," or "Overturn Roe v. Wade" -- would be subject to a permitting process and to numerous restrictions on form and placement from which other signs -- such as those "guiding traffic and parking" -- are exempt.

Exemption (10) allows holiday lights and decorations to be displayed freely. Thus, a homeowner could plant a giant illuminated Santa Claus or a jack-o-lantern in his front yard, but not a figure of, say, the President or the Mayor. An illuminated reindeer would be permissible, whereas a less festive animal such as a dog would not. Moreover, an array of multicolored, flashing holiday lights could cover a homeowner's roof year-round, whereas a simple political-campaign sign must, under § 27-583(6), be posted no more than two weeks before the election and removed within two days after.

29

Exemption (12) provides that certain "memorial" signs on buildings may be freely erected. A comparable sign identifying living occupants, however -- such as a plaque reading, "The Brown Family" -- could be displayed only after obtaining a permit.

Exemption (13) permits signs incorporated into machinery that advertise the service provided by the machine, but not comparable signs advertising the manufacturer or operator's favored causes, for example. Thus, a sign reading, "Mow Your Lawn With A John Deere," may receive more protection than one that says, "Support Your Local Public Schools" or "Support Your Local Police."

Exemption (17) covers "[r]eligious displays (e.g. nativity scenes)." Thus, a homeowner could display year-round, without a permit, a manger scene stretching across his entire front yard and bearing a sign reading, "Worship Our Savior." The scene could even include all of the features off-limits to nonexempt signs, such as moving parts, flashing lights, music, and even smoke. While that homeowner is free to employ limitless quantities of religiously themed figures, his neighbor could not freely display even a small, silent, stationary statue of the President, the Mayor, or any other secular figure, since such a display does not fall within any of the sign code's enumerated exemptions. Nor could he put up, for example, an image of a soldier bearing the sign, "Support Our Troops" or "Bring Our Troops Home."

30

Indeed, even to erect either sign alone, without the soldier figure, would require a permit because of the nature of the message.

Even those exemptions that favor certain speech based on the speaker, rather than the content of the message -- such as exemption (8) for "[o]fficial signs of a noncommercial nature erected by public utilities," and exemption (4) for signs "erected by, or on behalf of, or pursuant to the authorization of a governmental body" -- are content based. Under these exemptions, public utilities and government bodies may freely erect signs expressing their political preferences, their positions on public policy matters, and, indeed, their chosen messages on virtually any subject. Thus, while a public utility could post a sign proclaiming, for example, "Choose Electric Power," an individual homeowner or a private business could not display a sign reading, "Conserve Electricity: Use Solar Power." Similarly, while the city council could paper the entire City of Neptune Beach with signs advancing its agenda -- for example, "Support School Vouchers," or "Enlist in the National Guard" -- an individual resident could not freely post even a single yard sign advocating the opposing position -- for example, "Oppose School Vouchers," or "Abolish the National Guard."

The Supreme Court has "frequently condemned such discrimination among different users of the same medium for expression," which is another form of

31

content-based speech regulation.  <u>Mosley</u>, 408 U.S. at 96; <u>see also</u> <u>First Nat'l Bank</u>

<u>of Boston v. Bellotti</u>, 435 U.S. 765, 784-85, 98 S. Ct. 1407, 55 L. Ed. 2d 707

(1978) ("In the realm of protected speech, the legislature is constitutionally

disqualified from dictating the subjects about which persons may speak <u>and the</u>

<u>speakers who may address a public issue</u>." (emphasis added)).  <u>Cf.</u> <u>Ackerley</u>

<u>Communications of Mass., Inc. v. City of Somerville</u>, 878 F.2d 513, 518 (1st Cir.

1989) (striking down a sign ordinance whose "grandfather" clause allowed certain

speakers to use nonconforming signs, observing that "[e]ven if a complete ban on

nonconforming signs would be permissible, we must consider carefully the

government's decision to pick and choose among the speakers permitted to use

such signs").  The sign code exemptions that pick and choose the <u>speakers</u> entitled

to preferential treatment are no less content based than those that select among

subjects or messages.

Moreover, even insofar as § 27-581 simply allows some types of messages

to be displayed in a more prominent manner than others -- for example, using

flashing lights or moving parts -- it constitutes content-based regulation of speech.

<u>See</u> <u>Café Erotica of Fla., Inc. v. St. John's County</u>, 360 F.3d 1274, 1289 (11th Cir.

2004) (holding that limiting signs displaying political messages to a smaller size

than signs displaying other types of messages constituted content discrimination);

32

Whitton v. City of Gladstone, 54 F.3d 1400, 1410 (8th Cir. 1995) (holding that prohibiting external illumination of political signs while allowing it for other signs was an unconstitutional content-based restriction, since "the message on the sign determines whether or not it may be externally illuminated").

In short, because some types of signs are extensively regulated while others are exempt from regulation based on the nature of the messages they seek to convey, the sign code is undeniably a content-based restriction on speech.[14]

Accordingly, our second inquiry is whether the sign code survives strict scrutiny. A content-based restriction on speech must be "necessary to serve a compelling state interest" and "narrowly drawn to achieve that end." Perry Educational Ass'n v. Perry Local Educators Ass'n, 460 U.S. 37, 45, 103 S. Ct. 948, 74 L. Ed. 2d 794 (1983). The Neptune Beach sign code fails both aspects of this

_____

[14]Cf. Linmark Assocs., Inc. v. Twp. of Willingboro, 431 U.S. 85, 94, 97 S. Ct. 1614, 52 L. Ed. 2d 155 (1977) (striking down as unconstitutional an ordinance seeking to prevent the flight of white homeowners from racially integrated communities by prohibiting the posting of "For Sale" or "Sold" signs on property, reasoning that the ordinance "proscribed particular types of signs based on their content," without a compelling reason for doing so); Mosley, 408 U.S. at 94-95 (striking down on equal protection grounds -- which were "closely intertwined with First Amendment interests" -- an ordinance exempting peaceful labor picketing from a general prohibition on picketing near schools, observing that "[t]he central problem with Chicago's ordinance is that it describes permissible picketing in terms of its subject matter," and that "[t]he operative distinction is the message on a picket sign"); Carey v. Brown, 447 U.S. 455, 460-62, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980) (striking down, on equal protection grounds, a prohibition on picketing that exempted peaceful picketing of a place of employment involved in a labor dispute, since it discriminated "based upon the content of the demonstrator's communication," by according "preferential treatment to the expression of views on one particular subject").

requirement: the sign code is not narrowly tailored to accomplish the City's asserted interests in aesthetics and traffic safety, nor has our case law recognized those interests as "compelling."

Even if we were to assume that Neptune Beach's proffered interests in aesthetics or traffic safety were adequate justification for content-based sign regulations, the sign code cannot withstand strict scrutiny because it is not narrowly drawn to accomplish those ends. The problem is that the ordinance recites those interests only at the highest order of abstraction, without ever explaining how they are served by the sign code's regulations generally, much less by its content-based exemptions from those regulations. In Dimmitt, we noted that even if the government's interest in aesthetics and traffic safety could be sufficient justification for content-based regulation of signs, those interests "clearly are not served by the distinction between government and other types of flags; therefore, the regulation is not 'narrowly drawn' to achieve its asserted end." Dimmitt, 985 F.2d at 1570 (emphasis added) (quoting Perry, 460 U.S. at 45); see also, e.g., Gilleo, 986 F.2d at 1184 (holding that an ordinance was not narrowly drawn since it was not the "least restrictive alternative available").

The same is true here -- the sign code recites only the general purposes of aesthetics and traffic safety, offering no reason for applying its requirements to

34

some types of signs but not others. As to traffic safety, the ordinance states that motorists' safety "is affected by the number, size, location, lighting and movement of signs that divert the attention of drivers." § 27-574(2). The sign code therefore permits signs that are "[d]esigned, constructed, installed and maintained in a manner which does not endanger public safety or unduly distract motorists." § 27-575(2). The code does not, however, explain <u>how</u> these factors affect motorists' safety, or why a moving or illuminated sign of the permissible variety -- for example, a sign depicting a religious figure in flashing lights, which would be permissible under § 27-580(17)'s exemption for "religious displays" -- would be any less distracting or hazardous to motorists than a moving or illuminated sign of the impermissible variety -- for example, one depicting the President in flashing lights, which falls within no exemption and is therefore categorically barred by § 27-581(5)'s prohibition on signs containing "lights or illuminations that flash." Likewise, a homeowner could not erect a yard sign emitting an audio message saying, "Support Our Troops," since § 27-581(9) generally bans signs that "emit any sound that is intended to attract attention," but the government would be free to erect an equally distracting -- and presumably unsafe -- sign emitting the audio message, "Support Your City Council," since governmental signs are completely exempt from regulation under § 27-580(4).

35

Regarding aesthetics, the sign code states that "[u]ncontrolled and unlimited signs may degrade the aesthetic attractiveness of the natural and manmade attributes of the community." § 27-574(5). This provision similarly fails to explain how the sign code's content-based differentiation among categories of signs furthers the City's asserted aesthetic interests. For example, we are unpersuaded that a flag bearing an individual's logo (which is not exempt from regulation), is any less aesthetically pleasing than, say, a flag bearing the logo of a fraternal organization (which is exempt from regulation under § 27-580(3)). Nor is it clear to us that a government-authorized sign reading, "Support Your City Council" in flashing lights (which is exempt from regulation under § 27-580(4)), or a religious sign reading, "Support Your Church" (which is exempt under § 27-580(17)), degrades the City's aesthetic attractiveness any less than a yard sign reading, "Support Our Troops" in flashing lights.

Although the sign code's regulations may generally promote aesthetics and traffic safety, the City has simply failed to demonstrate how these interests are served by the distinction it has drawn in the treatment of exempt and nonexempt categories of signs. Simply put, the sign code's exemptions are not narrowly tailored to accomplish either the City's traffic safety or aesthetic goals.

Moreover, even if the sign code's regulations were narrowly tailored to

promote aesthetics and traffic safety -- and this codification does no such thing -- the plurality opinion in Metromedia and our decision in Dimmitt have said that these interests are not sufficiently "compelling" to sustain content-based restrictions on signs. In Metromedia, the plurality concluded that aesthetics and traffic safety constituted "substantial" but not "compelling" government interests, and thus were insufficient to justify the San Diego ordinance. Metromedia, 453 U.S. at 507-08 (plurality opinion). Subsequently, in Dimmitt, we declared that "[t]he deleterious effect of graphic communication upon visual aesthetics and traffic safety . . . is not a compelling state interest of the sort required to justify content based regulation of noncommercial speech." Dimmitt, 985 F.2d at 1570. Thus, we found the city's interests in aesthetics and traffic safety inadequate to justify exempting certain types of flags but not others from the city's sign permit requirement. Id. at 1569-70. "As a practical matter," we observed, "only the most extraordinary circumstances will justify regulation of protected expression based on its content." Id. at 1570.

Applying the Dimmitt analysis, we cannot reach a different conclusion in this case. The City has provided no justification, other than its general interests in aesthetics and traffic safety -- which are offered only at the highest order of abstraction and applied inconsistently -- for exempting certain types of signs but

37

not others.  We do not foreclose the possibility that traffic safety may in some circumstances constitute a compelling government interest, but Neptune Beach has not even begun to demonstrate that it rises to that level in this case.  Accordingly, we are constrained to conclude that Neptune Beach's sign code is not justified by a compelling government purpose.

Because its enumerated exemptions create a content-based scheme of speech regulation that is not narrowly tailored to serve a compelling government purpose, Neptune Beach's sign code necessarily fails to survive strict scrutiny.[15]  Moreover, these exemptions are not severable from the remainder of the ordinance; we are therefore required to find the sign code unconstitutional.[16]

---

[15]Solantic also argues that the sign code is an impermissible regulation of commercial speech under the Central Hudson test, which lays out a framework for evaluating the constitutionality of restrictions on commercial speech.  Commercial speech that is not misleading and does not advocate illegal activity may be regulated if the regulation directly advances a substantial governmental interest and reaches no further than necessary to accomplish that goal.  Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y., 447 U.S. 557, 564, 100 S. Ct. 2343, 65 L. Ed. 2d 341 (1980).  Because the sign code does not regulate commercial speech as such, but rather applies without distinction to signs bearing commercial and noncommercial messages, the Central Hudson test has no application here.

[16]"Severability of a local ordinance is a question of state law . . . ." City of Lakewood v. Plain Dealer Pub'g Co., 486 U.S. 750, 772, 108 S. Ct. 2138, 100 L. Ed. 2d 771 (1988); see also Coral Springs Street Sys., Inc. v. City of Sunrise, 371 F.3d 1320, 1347 (11th Cir. 2004).  As we have previously explained:

Florida law clearly favors (where possible) severance of the invalid portions of a law from the valid ones.  According to the Florida Supreme Court, "[s]everability is a judicial doctrine recognizing the obligation of the judiciary to uphold the constitutionality of legislative enactments where it is possible to strike only the unconstitutional portions." Ray v. Mortham, 742 So. 2d 1276, 1280 (Fla. 1999) (citing State v. Calhoun County, 126 Fla. 376, 383, 127 Fla. 304, 170 So. 883

38

(1936)).  The doctrine of severability is "derived from the respect of the judiciary for the separation of powers, and is 'designed to show great deference to the legislative prerogative to enact laws.'"  Id. (quoting Schmitt v. State, 590 So.2d 404, 415 (Fla. 1991)).

Coral Springs, 371 F.3d at 1347.

The Florida Supreme Court has articulated the following test for severability:

When a part of a statute is declared unconstitutional the remainder of the act will be permitted to stand provided: (1) the unconstitutional provisions can be separated from the remaining valid provisions, (2) the legislative purpose expressed in the valid provisions can be accomplished independently of those which are void, (3) the good and the bad features are not so inseparable in substance that it can be said that the Legislature would have passed the one without the other and, (4) an act complete in itself remains after the invalid provisions are stricken.

Id. at 1348 (quoting Smith v. Dep't of Ins., 507 So. 2d 1080, 1089 (Fla. 1962)).

Applying this test, we find that the exemptions contained in §§ 27-580 and 27-583(b) are not severable from the remainder of the sign code.  These provisions can be separated, since they are discrete sections of the statute, satisfying the first prong of Florida's severability test.  Additionally, the stated legislative purpose of improving traffic safety and aesthetics can still be accomplished without the exemptions, satisfying the second prong.

The problem lies with the third prong.  It is not clear that the legislature would have enacted the sign code, complete with its permit requirement and restrictions on form, even without the exemptions.  The legislature might have preferred not to impose these regulations on any signs if doing so meant that all signs would be subjected to these rules.  For example, we cannot say with any certainty that the legislature would have chosen to adopt a potentially time-consuming permitting process if even signs displayed only on a short-term basis -- such as those advertising festivals, sporting events, and religious functions, among other things, which are exempt under § 27-583(b)(5) -- were required to comply, since would-be advertisers might be unable to obtain permits in time for their events.  Similarly, we are not persuaded that the legislature would have chosen to ban signs using the words "stop," "look," and "danger," see § 27-581(13), if this rule applied even to governmental signs, which are exempt under § 27-580(4).  Because the general regulations and the exemptions are not "so inseparable in substance that it can be said that the Legislature would have passed the one without the other," Coral Springs, 371 F.3d at 1348, invalidating the scheme of exemptions requires us to invalidate the sign code in its entirety.

Solantic also says that the sign code is unconstitutional for the wholly independent reason that its failure to impose time limits for permitting decisions makes it an invalid prior restraint on speech. We agree that the absence of any time limits renders the sign code's permitting requirement unconstitutional.

Whether a licensing ordinance -- which constitutes a prior restraint on speech -- must contain a time limit within which to make licensing decisions depends on whether the ordinance is content based or content neutral. As we have previously explained, see Granite State Outdoor Adver., Inc. v. City of St. Petersburg, 348 F.3d 1278, 1281 (11th Cir. 2003), two Supreme Court cases establish the relevant framework.

First, in Freedman v. Maryland, 380 U.S. 51, 85 S. Ct. 734, 13 L. Ed. 2d 649 (1965), the Court invalidated a state law requiring motion pictures to be licensed prior to their release. The licensing board had discretion to deny licenses for films that were "obscene" or that "tend[ed], in the judgment of the Board, to debase or corrupt morals or incite to crimes." Id. at 52 n.2. In response to the danger of censorship posed by this ordinance, the Court held that the licensing process was valid only if it contained certain procedural safeguards, which the plurality opinion in FW/PBS, Inc. v. City of Dallas, 493 U.S. 215, 110 S. Ct. 596, 107 L. Ed. 2d 603 (1990), described in these terms:

40

> (1) any restraint prior to judicial review can be imposed only for a specified brief period during which the status quo must be maintained; (2) expeditious judicial review of that decision must be available; and (3) the censor must bear the burden of going to court to suppress the speech and must bear the burden of proof once in court.

Id. at 227. Although the Court was fragmented as to the precise extent of Freedman's applicability in FW/PBS, a majority of Justices reaffirmed the continuing validity of the first requirement -- strict time limits for licensing decisions. See id. at 227-28 (plurality opinion); id. at 238 (Brennan, J., concurring in the judgment).[17]

Subsequently, in Thomas v. Chicago Park District, 534 U.S. 316, 122 S. Ct. 775, 151 L. Ed. 2d 783 (2002), the Court upheld an ordinance requiring a permit before conducting any event involving more than fifty people. The Court distinguished Freedman, explaining: "Freedman is inapposite here because the licensing scheme at issue here is not subject-matter censorship but content-neutral

_____

[17]In FW/PBS, the Court applied Freedman's time-limit requirement to an ordinance regulating adult businesses through a scheme of zoning, licensing, and inspections. A majority held that the ordinance violated the First Amendment because it failed to impose strict administrative time limits and to provide for prompt judicial review, as required by Freedman. See FW/PBS, 493 U.S. at 227-28 (plurality opinion); id. at 238 (Brennan, J., concurring in the judgment). However, Justice O'Connor, writing for herself and two other Justices, found that only two of Freedman's protections -- strict administrative time limits and prompt judicial review -- applied to the licensing scheme. Id. at 228 (plurality opinion). Justice Brennan, writing for himself and two other Justices, would have applied all three of Freedman's safeguards, including the requirement that "the would-be censor . . . bear both the burden of going to court and the burden of proof in court." Id. at 239 (Brennan, J., concurring in the judgment).

time, place, and manner regulation of the use of a public forum." Id. at 322.

Because the Thomas ordinance was content neutral, the Court held that it was not

subject to the Freedman requirements, explaining that "[w]e have never required

that a content-neutral permit scheme regulating speech in a public forum adhere to

the procedural requirements set forth in Freedman." Id. However, the Court held

that the ordinance was subject to the requirement that it contain "adequate

standards to guide the licensing official's discretion and render it subject to

effective judicial review." Id. at 323.

Since Thomas, we have held that "time limits are not per se required when

the licensing scheme at issue is content-neutral." City of St. Petersburg, 348 F.3d

at 1282 n.6; see also Granite State Outdoor Adver., Inc. v. City of Clearwater, 351

F.3d 1112, 1118 (11th Cir. 2003) ("[T]ime limits are required when their lack

could result in censorship of certain viewpoints or ideas, but are not categorically

required when the permitting scheme is content-neutral." (emphasis and citation

omitted)). We have explained that "whether Freedman or Thomas controls . . .

depends on whether the City's sign ordinance is content-based or content-neutral."

City of St. Petersburg, 348 F.3d at 1281. Because Neptune Beach's sign code is

content based, its permitting scheme is subject to Freedman's time-limit

requirement. See Burk, 365 F.3d at 1255 n.12 ("A content-based prior restraint

42

must also satisfy the procedural requirements of Freedman v. Maryland." (citation omitted)); see also Café Erotica, 360 F.3d at 1282-83 (applying Freedman's time-limit requirement to a sign permit requirement that was facially content neutral, but contained "the potential for content-based decisionmaking," and finding the requirement satisfied since the ordinance required permit applications to be approved or denied within 14 days of submission).

To satisfy the time-limit requirement, an ordinance must "ensure that permitting decisions are made within a specified time period." Café Erotica, 360 F.3d at 1282. In Café Erotica, we found this requirement satisfied by a sign permit requirement explicitly providing that licensing decisions had to be made within 14 days. In contrast, "[a]n ordinance that permits public officials to effectively deny an application by sitting on it indefinitely is . . . invalid," since "[t]he opportunity for public officials to delay is another form of discretion." Lady J. Lingerie v. City of Jacksonville, 176 F.3d 1358, 1361-62 (11th Cir. 1999). We have repeatedly applied this requirement in the context of licensing schemes for adult businesses, interpreting it as requiring that the ordinance contain a specific provision explicitly limiting the period of time within which licensing officials must make permitting decisions.

Thus, for example, in Lady J. Lingerie v. City of Jacksonville, we struck

43

down a requirement that adult businesses obtain a zoning exemption. Although the zoning board was required to conduct a hearing within 63 days of the business's application, we held that "the ordinance's failure to require a deadline for decision renders it unconstitutional." Id. at 1363. In Redner v. Dean, 29 F.3d 1495 (1994), we struck down a licensing requirement for adult entertainment establishments, even though the ordinance placed a 45-day time limit on the administrator's licensing decision, since the ordinance further provided that in the event the administrator exceeded the 45-day limit, "the applicant may be permitted to begin operating the establishment for which a license is sought, unless and until the County Administrator notifies the applicant of a denial of the application." This provision, we held, rendered the time limit "illusory" and "risk[ed] the suppression of protected expression for an indefinite time period." Id. at 1500-01.

Again, in Artistic Entertainment, Inc. v. City of Warner Robins, 223 F.3d 1306 (11th Cir. 2000), we struck down a licensing requirement for adult entertainment establishments even though it required the city council to approve or deny a license application within 45 days. We reasoned that, "although [the ordinance] imposes a deadline on the City to consider an adult business license application, it does not guarantee the adult business owner the right to begin expressive activities within a brief, fixed time frame," since it did not provide for

44

what would happen if the city council, "because of bad faith or innocent bureaucratic delays, fails to act on an application before the deadline." Id. at 1310-11.

Neptune Beach's sign code contains no time limit of any sort for permitting decisions. Section 27-594, entitled "Permit application and approval procedures," provides: "Within ten (10) days after receipt of an application, the building official shall determine that the information is complete or incomplete and inform the developer of the deficiencies, if any." § 27-594(b). If the application is deemed incomplete, the applicant has ten days to correct the problem. If the application is complete, "the building official shall determine if the sign meets all provisions of this Code and shall issue the permit which states whether the application is approved, denied, or approved with conditions." § 27-594(b)(2).

However, no section of the sign code specifies any time period within which the building official must make this determination, thereby "risk[ing] the suppression of protected expression for an indefinite time period." Redner, 29 F.3d at 1500-01. The absence of any decisionmaking deadline effectively vests building officials with unbridled discretion to pick and choose which signs may be displayed by enabling them to pocket veto the permit applications for those bearing disfavored messages. The sign code's permitting requirement is therefore

45

precisely the type of prior restraint on speech that the First Amendment will not bear.

## III.

Although this case is before us on appeal from the denial of a preliminary injunction, we do not think it necessary or prudent to confine our opinion to holding that Solantic has shown a <u>likelihood</u> of success on the merits, when it is altogether clear that Solantic <u>will</u> succeed on the merits of its First Amendment claims. We recognize that, ordinarily, "when an appeal is taken from the grant or denial of a preliminary injunction, the reviewing court will go no further into the merits than is necessary to decide the interlocutory appeal." <u>Callaway v. Block</u>, 763 F.2d 1283, 1287 n.6 (11th Cir. 1985). However, under certain circumstances, a judgment on the merits is appropriate.

In <u>Thornburgh v. American College of Obstetricians & Gynecologists</u>, 476 U.S. 747, 106 S. Ct. 2169, 90 L. Ed. 2d 779 (1986), <u>overruled on other grounds by</u> <u>Planned Parenthood v. Casey</u>, 505 U.S. 833, 112 S. Ct. 2791, 120 L. Ed. 2d 674 (1992), the Supreme Court held that the court of appeals had jurisdiction, on an appeal from the district court's denial of a preliminary injunction, to strike down as unconstitutional portions of a Pennsylvania abortion statute, and affirmed the judgment of the court of appeals on the merits. <u>See id.</u> at 755-57. The Court

observed that appeals courts' general approach of reviewing only the decision on whether to grant preliminary injunctive relief "is not inflexible," id. at 756, reasoning: "That a court of appeals ordinarily will limit its review in a case of this kind to abuse of discretion is a rule of orderly judicial administration, not a limit on judicial power." Id. at 757; accord Callaway, 763 F.2d at 1287 n.6 ("[T]his rule is a rule of orderly judicial administration only. Section 1292(a)(1) of Title 28 of the United States Code,[18] which governs appeals of interlocutory orders denying/granting injunctions, grants the courts jurisdiction to reach the merits, at least where there are no relevant facts at issue and the matters to be decided are closely related to the interlocutory order being appealed."); 16 Charles Alan Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 3921.1, at 28 (2d ed. 1996) ("Jurisdiction of the interlocutory appeal is in large measure jurisdiction to deal with all aspects of the case that have been sufficiently illuminated to enable decision by the court of appeals without further trial court development.").

We have, on a number of occasions, reached the merits of cases before us on interlocutory appeal from the grant or denial of a preliminary injunction. In

---

[18]28 U.S.C. § 1292(a) states, in pertinent part, that "courts of appeals shall have jurisdiction of appeals from: (1) Interlocutory orders of the district courts . . . granting, continuing, modifying, refusing, or dissolving injunctions."

Callaway v. Block, for example, we affirmed the district court's denial of a preliminary injunction and disposed of the plaintiffs' statutory construction and due process claims on the merits, "since both sides' arguments go to the merits, no facts are at issue, and the questions raised are purely legal ones." Callaway, 763 F.2d at 1287. We observed: "Reaching the merits in cases such as these obviously serves judicial economy, as long as the facts are not disputed and the parties have presented their arguments to the court." Id. at 1287 n.6.

More recently, in Burk v. Augusta-Richmond County, 365 F.3d 1247 (11th Cir. 2004), a panel of this Court proceeded to the merits of a case before us on interlocutory appeal from the district court's denial of a preliminary injunction, and struck down on First Amendment grounds the county's permitting requirement for public demonstrations. Reaching the merits was appropriate, we found, since the appeal presented pure questions of law, and since "our disposition dictates the outcome of the underlying claim." Id. at 1250; see also, e.g., Clements Wire & Mfg. Co. v. NLRB, 589 F.2d 894, 897-98 (5th Cir. 1979)[19] (finding it "apparent that appellee will not succeed on the merits of its action" and thus vacating the preliminary injunction and remanding "with instructions to the district court to

[19]The Eleventh Circuit has adopted as precedent the decisions of the former Fifth Circuit rendered prior to October 1, 1981. Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981).

48

enter a judgment consistent with this opinion"); <u>Siegel</u>, 234 F.3d at 1171 n.4

(observing that the court has the authority to reach the merits on appeal from denial

of preliminary injunction, but declining to do so, since the factual record was

"largely incomplete and vigorously disputed"); <u>Mercury Motor Express, Inc. v.</u>

<u>Brinke</u>, 475 F.2d 1086, 1091 (5th Cir. 1973) (reviewing the district court's

issuance of a stay order that was not independently appealable, reasoning:

"Because this case is properly before the court as an appeal from the denial of an

injunction under 28 U.S.C.A. § 1292(a)(1) . . . our permissible scope of review

extends to the stay order as well.  A court of appeals normally will not consider the

merits of a case before it on an interlocutory appeal except to the extent necessary

to decide narrowly the matter which supplies appellate jurisdiction, but this rule is

one of orderly judicial administration and not a limit on jurisdictional power.

'[O]nce a case is lawfully before a court of appeals, it does not lack power to do

what plainly ought to be done.'" (quoting 9 Moore's Federal Practice ¶ 110.25[1]

(2d ed. 1972))).[20]

---

[20]Numerous other Circuits have also recognized the appropriateness, in limited circumstances, of reaching the merits of a case before the court on interlocutory appeal from the grant or denial of a preliminary injunction.  <u>See, e.g.</u>, <u>Hurwitz v. Directors Guild of Am., Inc.</u>, 364 F.2d 67, 69-70 (2d Cir. 1966) (reversing denial of preliminary injunction and directing entry of judgment for plaintiffs on the merits, reasoning that doing so "serve[d] the obvious interest of economy of litigation" and was appropriate since the case "contain[ed] no triable issue of fact"); <u>Amandola v. Town of Babylon</u>, 251 F.3d 339, 343-44 (2d Cir. 2001) (reversing denial of preliminary injunction and striking down permitting requirement for use of town facilities on First Amendment grounds); <u>United Parcel Serv., Inc. v. United States Postal Serv.</u>, 615 F.2d 102,

49

As the Supreme Court has explained, appellate review on the merits is properly conducted "if a district court's ruling rests solely on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance." Thornburgh, 476 U.S. at 757. "A different situation is presented, of course, when there is no disagreement as to the law, but the probability of success on the merits depends on facts that are likely to emerge at trial." Id. at 757 n.8.

Because the case before us falls into the first category, reaching a decision on the merits is the wiser course. The facts of the case are simple and straightforward, and the record needs no expansion. The First Amendment questions -- which are the only issues before us -- are purely legal; indeed, Solantic's constitutional challenge to the sign code is facial rather than as applied, so that our resolution of the legal questions is only minimally intertwined with the facts. Moreover, the parties have fully briefed the legal issues and cogently presented them to both the district court and this Court.

───────────────

106-07 (3d Cir. 1980) (reaching the merits because the case involved "a pure question of law," the legal question was "intimately related to the merits of the grant of preliminary injunctive relief," and the legal issue would not "be seen in any different light after final hearing than before"); Doe v. Sundquist, 106 F.3d 702, 707-08 (6th Cir. 1997) (finding that reaching the merits was "in the interest of judicial economy," since "the legal issues have been briefed and the factual record does not need expansion"); Illinois Council on Long Term Care v. Bradley, 957 F.2d 305, 310 (7th Cir. 1992) ("Since plaintiffs cannot win on the merits, there is no point in remanding the case for further proceedings. Therefore we affirm the district court's judgment and remand with instructions to dismiss the case on the merits."); Campaign for Family Farms v. Glickman, 200 F.3d 1180, 1185-87 (8th Cir. 2000) (reaching the merits because "we are faced with a purely legal issue on a fixed administrative record").

In addition, resolving the legal questions finally will substantially further the interests of judicial economy. Determining, de novo, whether the district court correctly found Solantic unlikely to succeed on the merits requires us to address complex and purely legal First Amendment issues that the district court has already fully considered once. Accordingly, "there is no point in remanding the case" for the district court to go through the motions of deciding the merits of Solantic's First Amendment claims yet again, when our opinion compels the result to be reached. Illinois Council, 957 F.2d at 310.

We therefore hold that Solantic prevails on the merits of these First Amendment claims, since the exemptions from Neptune Beach's sign code render it an unconstitutional content-based scheme of speech regulation, and since the sign code's lack of any time limits for permitting decisions make it an unlawful prior restraint on speech. We underscore that we express no opinion on -- and leave it to the district court to consider on remand -- Solantic's requests for permanent injunctive relief and for a declaration that it is not liable for accrued fines.

**REVERSED and REMANDED.**